2013 COA 39

Jillian GROH, individually and by and through her guardians and conservators, William and Janelle Groh, Plaintiff–Appellant,

v.

WESTIN OPERATOR, LLC, Defendant–Appellee.

Court of Appeals No. 11CA0363

Colorado Court of Appeals, Div. IV.

Announced March 28, 2013

The Law Offices of Alan C. Shafner, Alan C. Shafner, Greenwood Village, Colorado, for Plaintiff–Appellant.

The Waltz Law Firm, Richard A. Waltz, John D. Halepaska, Denver, Colorado, for Defendant–Appellee.

Opinion by JUDGE WEBB

¶ 1 This personal injury action presents an issue of first impression in Colorado: whether a hotel's duty of care to a guest requires that, in lawfully evicting the guest, the hotel act reasonably. We conclude that a hotel must evict a guest in a reasonable manner, which precludes ejecting a guest into foreseeably dangerous circumstances resulting from either the guest's condition or the environ-

ment. We further conclude that here a reasonable jury could find a breach of this duty on the present record. Therefore, we reverse the summary judgment against plaintiff, Jillian Groh, and in favor of defendant, Westin Operator, LLC (the Westin), in part, and remand for further proceedings, limited to her negligence claim based on the eviction.

## I. Facts for Purposes of Summary Judgment

### A. The Eviction

¶ 2 Groh planned to spend the night of March 3, 2007, with friends visiting night clubs in downtown Denver. She reserved a room at the Westin's downtown hotel. Although Groh was the only registered guest, two of her female friends checked in with her and the Westin gave each of them a key to the room.

¶ 3 After having consumed alcoholic beverages throughout the evening, Groh, the two girlfriends, and eight other persons gathered in the room. Around 2:45 a.m., a security guard heard loud noises coming from Groh's room. Although no other guests had complained, the guard went to the door and asked for the person in charge. Over the next few minutes, a series of escalating interactions occurred among this guard, a second guard, the hotel manager, Groh, and some of the others in the room. One guard entered the room without Groh's permission, to which she objected.

¶ 4 During these interactions, at least one person told the Westin employees that everyone in the group was "drunk," "that was the whole purpose" of the room having been rented, and the guard could not expect them to leave because "We are drunk. We can't drive." Ultimately, because Groh was the registered guest, the manager asked that she stay, but would not let the others remain. Groh said that she would leave as well.

¶ 5 During the negotiations between Groh and the Westin employees, several members of her party decided to leave the hotel and were not involved in any of the following events. Shortly after 3:00 a.m., Groh and the remainder of her group were escorted to the front entrance of the hotel by the guards. Although police officers were on the premises investigating an unrelated incident, the Westin did not involve them.

¶ 6 The first security guard blocked the doorframe with his body as the last person exited. One of Groh's friends asked the guard, "Hey, man, it's freezing out here, can we wait in the lobby while we get a cab?" The guard crossed his arms and said, "No, get the f* * * out of here."[1]

### B. The Accident

¶ 7 Groh and the remaining six persons in the group walked down a ramp into the parking garage below the hotel. They passed several vehicles, including a taxi. Angela Reed offered to drive. Groh handed Reed the keys to her vehicle. Groh and the others entered the vehicle, with Reed behind the wheel.

¶ 8 Around 4:00 a.m., several miles from the hotel in route to Groh's home, Reed rear-ended a vehicle that was traveling well below the speed limit. A toxicology expert estimated that Reed's blood alcohol content was between 0.170 and 0.222 at the time of the accident. Groh sustained severe and permanent injuries.

### C. The Trial Court's Ruling

¶ 9 Groh sued the Westin for damages under several negligence and breach of contract claims. The trial court granted summary judgment for the Westin, concluding in relevant part:

[B]ased on [Groh]'s alleged claims for negligence, in order for [the] Westin to be liable for negligence there must be a duty for a hotel, when evicting guests, to ensure that they do not drive away drunk.

. . . .

This Court holds that hotels do not have a legal duty to prevent injuries subsequent to eviction by preventing drunk driving. To hold otherwise would put hotels in the

---

1. This witness also testified during the deposition, "And I remember wearing what I was wearing, I was freezing."

impossible position of exercising control over others when they have no right to do so.

¶ 10 The court also found that the Westin had the right to evict Groh and the group based on her breach of the contract, and that the Westin had not waived its right to object to the number of persons in the room:

> Groh breached her contract by inviting more than three people to stay at her room in the hotel, and this alone is enough to justify [the] Westin's termination of the contract.
>
> Arguably, [the] Westin waived its right to insist that only one person stay in the room when it knowingly and intentionally issued three keys.
>
> . . . .
>
> However, it did not waive its rights with regard to any persons above that number. Testimony favoring both sides reveals that between seven and eleven people were staying in the room. Therefore, when [the] Westin discovered the breach of contract, it was within its contractual rights to revoke the property right provided by the contract and to evict the guests.

## II. Summary Judgment

¶ 11 Appellate review of summary judgment is de novo, *Woods v. Delgar Ltd.,* 226 P.3d 1178, 1180 (Colo.App.2009), informed by the following principles. Summary judgment is appropriate only when the pleadings, affidavits, depositions, answers to interrogatories, or admissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo.1987). The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party. *Continental Air Lines,* 731 P.2d at 712. The nonmoving party is entitled to the benefit of all favorable inferences reasonably drawn from the undisputed facts, and all doubts are resolved against the moving party. *A.C. Excavating v. Yacht Club II Homeowners Ass'n,* 114 P.3d 862, 865 (Colo.2005).

¶ 12 Applying these principles to the existing record, the following questions must be resolved in Groh's favor at this stage of the proceedings:

- Whether she was intoxicated;
- Whether she was assaultive or otherwise threatening to other guests while in the hotel;
- Whether the "freezing" outside temperature at the time of the eviction posed a risk to her;
- Whether the request to wait for a taxi in the lobby was made on her behalf.

In addition, for purposes of summary judgment only, the Westin concedes that Groh was evicted.

## III. Duties of an Innkeeper

¶ 13 The special relationship between an innkeeper and a guest obligates the innkeeper to exercise ordinary care concerning the guest. *See, e.g., Burchmore v. Antlers Hotel Co.,* 54 Colo. 314, 317, 130 P. 846, 847 (1913). As a corollary of this duty, other jurisdictions recognize that an innkeeper can evict a guest only "in a manner reasonable under the circumstances." *Rodriguez v. Primadonna Co.,* 125 Nev. 578, 216 P.3d 793, 798 (2009); *Raider v. Dixie Inn,* 198 Ky. 152, 248 S.W. 229, 230 (1923) (innkeeper must remove guest in a reasonable manner). Although the Colorado appellate courts have not addressed the latter principle, we find such cases well-reasoned and follow them here.

### A. Scope of the Duty to Evict in a Reasonable Manner

¶ 14 In *Dagen v. Marriott International, Inc.,* 2006 WL 3728344, *4 (N.D.N.Y. No. 1:05CV1593, Dec. 18, 2006) (unpublished memorandum decision denying defendant's summary judgment motion), the court explained, "Defendants could reasonably foresee that some type of harm awaited Plaintiff if they expelled him from the hotel. Common sense and common courtesy hold that innkeepers are expected to shelter those who have sought their protection—and have a duty not to inject those same people into obviously dangerous situations." However, the court did not describe the perils involved.

At a minimum, circumstances such as the guest's condition and the environment outside the hotel will influence the reasonable manner calculus. *See McHugh v. Schlosser*, 159 Pa. 480, 28 A. 291, 292 (1894) ("The question which the defendants were bound to consider before putting the decedent out in the storm was not whether such exposure 'would' surely cause death, but what was it reasonable to suppose might follow such a sudden exposure of the decedent in the condition in which he then was.").

¶ 15 Our supreme court has treated common carriers like innkeepers for purposes of special relationship analysis. *Univ. of Denver v. Whitlock*, 744 P.2d 54, 58 (Colo.1987). Hence, common carrier cases involving ejection of passengers are informative.

[3] ¶ 16 A common carrier may be liable for injuries caused by exercising its right to eject a passenger "at a time or place which is dangerous." *McCoy v. Millville Traction Co.*, 83 N.J.L. 508, 85 A. 358, 360 (E. & A.1912) (drunken passenger was ejected into the snow); *see also Bragg's Adm'x v. Norfolk & W. Ry. Co.*, 110 Va. 867, 67 S.E. 593, 595 (1910) ("the condition of the weather and of the place where he was ejected ... would naturally imperil his safety, in addition to his intoxicated condition"); *Texas Midland R.R. Co. v. Geraldon*, 54 Tex.Civ.App. 71, 117 S.W. 1004, 1007 (1909) ("the right to eject must be exercised in a proper manner and at the proper time and place"), *aff'd*, 103 Tex. 402, 128 S.W. 611 (1910); *Brown v. Chicago, Rock Island & Pac. R.R. Co.*, 51 Iowa 235, 1 N.W. 487, 490 (1879) ("all the circumstances should be considered; as the physical condition of the person ejected; the time, whether in daylight or late at night; ... the place of the

ejectment; ... [and] the character of the weather, whether pleasant or inclement"); *Commerce Ins. Co. v. Ultimate Livery Service, Inc.*, 452 Mass. 639, 897N.E.2d 50, 57 (2008) ("the tort defendants owed a duty of reasonable care to avoid discharging a passenger, who they knew, or should have known, was intoxicated and likely to drive an automobile"); *Kelleher v. F.M.E. Auto Leasing Corp.*, 192 A.D.2d 581, 596 N.Y.S.2d 136, 139 (1993) (cab driver who ejected an intoxicated passenger into the snow was under duty "to care for its intoxicated passenger in a prudent manner, not to leave him in a worse position than when it took charge of him").[2]

¶ 17 Also informative are cases alleging wrongful eviction of a patron from a tavern. For example, in *Hoff v. Elkhorn Bar*, 613 F.Supp.2d 1146, 1154, 1160 (D.N.D.2009), the court held that "Defendants were under a duty to exercise reasonable care and to take reasonable action as to their patrons, including a general duty to exercise reasonable care in ejecting Randall Hoff from the Elkhorn Bar in the midst of winter." Similarly, in *Harris v. Gower, Inc.*, 153 Ill.App.3d 1035, 106 Ill.Dec. 824, 506 N.E.2d 624, 626 (1987), the court recognized that "Plaintiff properly predicated her complaint on the fact that defendants' placing of the unconscious decedent in his truck on a very cold winter night is the act which allegedly led to plaintiff's husband's death."[3]

¶ 18 Therefore, we conclude that although the Westin properly terminated its contract with Groh and then could evict her, the disputed facts and favorable inferences noted above preclude finding, as a matter of law, that it did so in a reasonable manner.

2. *But see Wright v. Webb*, 234 Va. 527, 362 S.E.2d 919, 922 (1987) (declining to apply common carrier law to ejection of a business invitee). However, because of the special relationship that exists between an innkeeper and its guests, a guest is not merely a business invitee. *See Whitlock*, 744 P.2d at 58.

3. According to the court in *Hoff*, "the dram shop statutes do not supersede all common law liability of bar owners." 613 F.Supp.2d at 1154. As the *Harris* court explained, although the "Dram Shop Act is the exclusive remedy against tavern owners and operators for injuries caused by an

intoxicated person or in consequence of intoxication," the plaintiff's claims were proper under common law for negligence in the eviction. Thus, "[a]lthough plaintiff alleged in the complaint that defendants sold and supplied intoxicating liquor to the decedent causing decedent to become unconscious, it is not the act that allegedly resulted in decedent's death." 106 Ill.Dec. 824, 506 N.E.2d at 626. Here, as in *Hoff* and *Harris*, the basis for the Westin's liability is unreasonableness in evicting Groh, given her intoxication and other factors, not its having served her alcoholic beverages.

On the present record, a reasonable jury could find that:

- The Westin did not act reasonably because of Groh's intoxicated condition (and that of her companions), the late hour, and the "freezing" outside temperature, which might have exposed her to a foreseeable risk of injury, and

- The Westin could have mitigated this risk by telling Groh (or her companion, who sought reentry but was barred) that she could wait in the lobby a reasonable time for a taxi, which it could have called for her; or it could have summoned police officers, who were on the premises in an unrelated matter, and turned her over to an officer for a welfare check and transportation to a detox facility, if appropriate.

¶ 19 The Westin's assertion that its special relationship to Groh ended upon culmination of the eviction, thereby precluding liability for post-eviction harm proximately caused by its failure to evict in a reasonable manner, is unpersuasive. In *Sheron v. Lutheran Medical Ctr.*, 18 P.3d 796 (Colo.App.2000), a division of this court upheld a jury verdict against the hospital on the basis that emergency department personnel had acted unreasonably in failing to conduct an adequate mental health status examination and discharging plaintiff's deceased, who committed suicide the next day, rather than placing him under a mental health hold. *See also Jefferson County Sch. Dist. R-1 v. Justus*, 725 P.2d 767, 772 (Colo.1986) (reversing summary judgment for school district because, having undertaken "the task of enforcing a rule that students in the lower grades were not eligible to ride bicycles to and from school," district could be liable for student's injuries several blocks away from the school suffered in a bicycle/ automobile accident as student rode home).

■ ¶ 20 As these cases recognize, a duty of care may be found even where the injury resulting from a breach of that duty occurred after the parties' relationship ended, off the defendant's premises, or both. *See also*

*Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1150 (7th Cir.2010) (recognizing under Illinois law, claim against tavern for injuries suffered by patron in escaping from other patrons, who bartender allegedly knew intended to assault her, after they left the bar, and explaining, "the fact that Reynolds' injuries were sustained more than one mile away from CB Sports's bar does not necessarily preclude finding a duty here").

¶ 21 Although the explanation for partially reversing the summary judgment could end here, no Colorado appellate court has addressed a hotel's duty to evict in a reasonable manner, and the analogies to common carrier and tavern cases could be challenged. For these reasons, we turn to general duty principles and reexamine our conclusions that the Westin owed Groh a duty to act reasonably in the eviction, and that the record includes evidence from which a reasonable jury could find that the Westin did not act with ordinary care in doing so.[4]

## B. Scope of Innkeeper's Duty

### 1. General Duty Principles

■ ¶ 22 To establish a prima facie negligence claim, a plaintiff must show (1) a legal duty of the defendant, (2) breach of that duty, (3) causation, and (4) damages. *See, e.g., Davenport v. Cmty. Corr. of Pikes Peak Region, Inc.*, 962 P.2d 963, 966 (Colo.1998).

■ ¶ 23 Because the threshold issue is whether the defendant owed the plaintiff a duty, "[a] negligence claim must fail if [it is] based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff." *Whitlock*, 744 P.2d at 56. Whether a particular defendant owes a legal duty of care to a particular plaintiff is a question of law subject to de novo review. *Bath Excavating & Constr. Co. v. Wills*, 847 P.2d 1141, 1147 (Colo.1993); *Woods*, 226 P.3d at 1180.

■ ¶ 24 Breach of duty is determined based on a standard of conduct, typically— and for innkeepers, exclusively—ordinary

---

4. This examination also explains our belief that the dissent has conflated duty, standard of con- duct, and proximate cause.

care. *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo.2002). Thus, "[o]nce the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform." *Imperial Distrib. Services, Inc. v. Forrest*, 741 P.2d 1251, 1254 (Colo.1987) (quoting Restatement (Second) of Torts § 328B cmt. f (1965)). After being instructed on the standard of conduct, the jury applies this standard to the facts of the case. *Id.* at 1256.

¶ 25 In answering the duty question, a court must consider many factors, "including, for example, the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor." *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo.1992) (quoting *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo.1986), *superseded by* § 13–21–115, C.R.S.1987, *as recognized in Vigil v. Franklin*, 103 P.3d 322, 325 n.3 (Colo.2004)). Other factors include, "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and availability, cost, and prevalence of insurance." *Whitlock*, 744 P.2d at 57 n.2; *see also Wheeler v. Eagle County*, 666 P.2d 559, 562 (Colo.1983) (Rovira, J., dissenting) (factors include "the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread") (quoting *Raymond v. Paradise Unified Sch. Dist.*, 218 Cal.App.2d 1, 31 Cal.Rptr. 847, 851 (1963)).

¶ 26 These factors are not exclusive, no single factor controls, "and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Whitlock*, 744 P.2d at 57 (quoting *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987)).

### 2. Nonfeasance/ Malfeasance

¶ 27 Both the Westin and the dissent correctly point out that our supreme court has been more hesitant in applying these factors to find duty in cases of failure to act (nonfeasance) rather than in cases of negligent action (malfeasance). In *Whitlock*, 744 P.2d 54, for example, the court found that mere authority to regulate trampoline use on university-owned property "militates against" creating a duty to a person injured while using a trampoline owned by a fraternity on property it leased from the university. *Id.* at 57. But here, analyzing Groh's case as purely a failure to act is unhelpful, for two reasons.

¶ 28 First, nonfeasance liability exists in "a limited group of special relationships between parties." *Id.* at 58. Examples of those relationships "include common carrier/ passenger, innkeeper/guest, [and] possessor of land/invited entrant." *Id.* "The genesis for the special relationship analysis lies in the jurisprudence of tort law," *Henderson v. Gunther*, 931 P.2d 1150, 1155 (Colo.1997), not the terms of the parties' contracts. Thus, within such special relationships, one of which is before us, the general duty factors still apply, even where only nonfeasance is alleged. *See Taco Bell*, 744 P.2d at 46 (affirmative duty owed to take steps to protect business invitees from robbery of business).

¶ 29 Second, in *Whitlock*, 744 P.2d at 59 n.4, the court recognized that "under some fact situations the difference between negligent action and negligent failure to act can be simply a matter of characterization." *Id.* It explained that the "present case is one of *pure* failure to act ... where the University ... had no part in creating [the peril]" (emphasis added). *Id.*

¶ 30 In contrast, a jury could find that the Westin set in motion the chain of events that led to Groh's injury by entering her room without permission; deciding to evict her notwithstanding the absence of any complaints from other guests; and then—despite knowing that she was intoxicated and was accompanied by others who were as well—escorting her from the premises rather than allowing her to wait for a taxi in the lobby, a

public area. *See Smit v. Anderson*, 72 P.3d 369, 373 (Colo.App.2002) (applying misfeasance analysis to impose a duty to supervise a party injured while constructing a house on a general contractor whose only role in the project was pulling a building permit on the homeowner's behalf, as this act "created the circumstances that placed Smit at risk of harm").

3. Application of General Duty Factors to Innkeeper Lawfully Evicting Guest

a. Foreseeability of Injury

¶ 31 "[F]oreseeability 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.'" *Taco Bell*, 744 P.2d at 48 (quoting 3 F. Harper, F. James, & O. Gray, *The Law of Torts* § 18.2, at 658–59 (2d ed. 1986)).

¶ 32 Reasonably foreseeable risks involved in evicting a guest could arise during the eviction because of the guest's need for assistance or particular vulnerability to any force involved. Such risks could also arise after the eviction as to a guest who, like Groh, is intoxicated and far from home, late on a winter evening, and in the company of other intoxicated persons. Such a guest cannot immediately mitigate the intoxication, and thus is suffering from impairment of both physical abilities and judgment. The guest could be harmed by circumstances beyond the guest's practical control—for example, the guest could slip and fall on ice or walk into a low-visibility location, pass out, and suffer hypothermia.

¶ 33 The particular risk that ripened into injury here—entering a vehicle, entrusting an intoxicated person to drive, and crashing several miles away from the Westin—is not the measure of reasonable foreseeability for purposes of deciding duty. *See Ballard v. Uribe*, 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 628 n.6 (1986) ("a court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party").

¶ 34 The dissent's reliance on *Whitlock*, 744 P.2d at 57, to constrain the duty inquiry, based on the particular injury that Groh sustained, is unpersuasive because the plaintiff in *Whitlock* suffered the only type of injury—falling off a trampoline—possible from breach of the alleged duty, failure to require supervision of a trampoline in a public area. Instead, the duty inquiry should be limited to whether Groh is a member of a class—intoxicated guests—to whom harm from eviction is reasonably foreseeable. *See White v. Pines Enterprises, Inc.*, 728 P.2d 759, 761 (Colo.App.1986) (landscaper who sprinkled sidewalk on a cold day "owed a general duty of care *to all persons who might reasonably be foreseen to incur physical injuries* as a result of such conduct," and "Plaintiffs were within that class of persons") (emphasis added); *see also Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 105 (Colo. App.2008) (recognizing "a risk that *either friends and family members* using its storage lot or third parties could be injured") (emphasis added); *In re Estate of Blacher*, 857 P.2d 566, 568 (Colo.App.1993) ("A duty of reasonable care may arise when there is a foreseeable risk of injury *to others* from a defendant's failure to take protective action to prevent the injury.") (emphasis added).

¶ 35 If a plaintiff comes within such a class, remoteness of the peril that ripens does not negate duty. *See Doe v. Sisters of Holy Cross*, 126 Idaho 1036, 895 P.2d 1229, 1234 n.2 (Idaho Ct.App.1995) ("A distinction exists, however, in that a breach of the duty of care may occur and yet the plaintiff's particular injury may exceed all bounds of reasonable foreseeability.") (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* §§ 42–43 (5th ed. 1984)).

¶ 36 Hence, if a court finds a duty and a trier of fact concludes that a defendant breached this duty by failing to act according to the standard of conduct, the particular risk that ripens presents only an issue of proximate cause. *See Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1021 (Colo.2006) (Mullarkey, C.J., concurring

in part and dissenting in part) (quoting Restatement (Third) of Torts § 29 cmt. f (Proposed Final Draft No. 1, 2005)) ("[D]uty is a preferable means for addressing limits on liability when those limitations are clear, are based on relatively bright lines, [and] are of general application.... On the other hand, when the limits imposed require careful attention to the specific facts of a case, and difficult, often amorphous evaluative judgments for which modest differences in the factual circumstances may change the outcome, scope of liability [or proximate cause] is a more flexible and preferable device for placing limits on liability."); *Nelson v. Commonwealth Edison Co.*, 124 Ill.App.3d 655, 80 Ill.Dec. 401, 465 N.E.2d 513, 519 (1984) ("While foreseeability is thus a proper matter for a court to consider in making its duty determination, the sounder approach would be to recall that the duty issue is broad in its implication and it is only the jury's negligence determination which need be strictly confined to the facts of the particular case.").

### b. Social Utility of Eviction

¶ 37 The social utility of allowing an innkeeper to lawfully end the special relationship with a guest and evict the guest is significant. However, requiring that the innkeeper act reasonably in evicting the guest, where the circumstances place the guest at risk during the eviction or present an imminent risk of post-eviction injury, would not outweigh that social utility. For example, the duty of care involving an intoxicated guest could be satisfied by providing the guest with mobility support during the eviction, allowing the guest to remain on the premises long enough to call a taxi, offering to call a taxi for the guest, or turning the guest over to a police officer for a welfare check and, if appropriate, transportation to a detox facility. The burden on innkeepers to take such steps would be "relatively inexpensive." *Taco Bell*, 744 P.2d at 49. Hence, the

costs would be properly "borne by the owner, operator, and, indirectly, the customers." *Id.*[5]

### c. Countervailing Duties

¶ 38 Innkeepers have a duty "to use reasonable care to protect its guests from third persons." *Allen v. Ramada Inn, Inc.*, 778 P.2d 291, 293 (Colo.App.1989); *see also* Restatement (Second) of Torts § 344 cmt. d (1965). According to the Westin, were it required to allow an evicted guest such as Groh, whom it had already determined had no right to remain on the premises, to stay in the lobby, the Westin would be at risk of breaching its duty to other guests if an altercation with Groh ensued. However, this assertion conflates the broad duty question with circumstances informative of what would be required of the innkeeper to meet the ordinary care standard of conduct by evicting in a reasonable manner under the particular facts presented.

¶ 39 Here, as indicated, a question exists whether Groh's own behavior posed any risk to other guests. From the evidence in the present record, a jury might reasonably conclude that the sole basis for eviction was Groh allowing too many people into her room. Such action does not suggest peril to other guests. Hence, the jury must be allowed to decide whether the Westin could have reconciled these competing duties by permitting Groh to remain in the lobby for the limited time required to summon a taxi, while having the guard who had positioned himself in the doorway or the other guard who had been involved in the eviction monitor her, if necessary.[6]

### d. Consequences of Imposing a Duty

¶ 40 The consequences of holding an innkeeper responsible for failing to exercise ordinary care in evicting a guest who became

**5.** In *Taco Bell*, 744 P.2d at 49, the court identified the following measures to discourage or deal with robberies: "making sure the restaurant is well illuminated, installing highly visible video cameras, keeping small amounts of cash in the registers, posting signs notifying potential robbers of the small amount of cash kept on the premises, training employees in methods for dealing with in-process robberies, and locking non-public entrances during nighttime hours."

**6.** Since only Groh is a party to this action, we need not decide whether the Westin would have any duty to allow any other member of the group to remain.

intoxicated would not, as the dissent suggests, unfairly shift responsibility from the guest to a person or entity that had no role in causing such intoxication. A guest who, like Groh, reserves a room in anticipation of possible intoxication is attempting to reduce the risks that would otherwise arise from becoming intoxicated, far from home and late on a winter evening. Merely returning to a reserved hotel room in an intoxicated state does not create significant risk. Nor does inviting other people into the room.

¶ 41 Further, innkeepers are in a better position than guests to take steps that would avoid injury arising from a guest's intoxication, such as those discussed under Social Utility of Eviction above.[7] The guest's intoxication will dissipate only with the passage of time; until then, the guest will suffer from impaired judgment, among other limitations. But the innkeeper's personnel deciding how to handle an eviction should be unimpaired.

¶ 42 Moreover, recognizing an innkeeper's duty to evict in a reasonable manner does not absolve Groh from personal responsibility. *See* § 13–21–111, C.R.S.2012 (comparative negligence). As explained in *Commerce Ins. Co.*, 897 N.E.2d at 60, Groh's conduct "will be a factor for the jury to consider in deciding whether [the Westin's] duty was violated, and in determining causation."

¶ 43 Based on these factors, we conclude that reasonable persons would recognize an innkeeper's duty to evict in a reasonable manner, including steps which would protect a guest who is being evicted from reasonably foreseeable harm suffered by the guest during or shortly after the eviction. This conclusion accords with the statement in *New Albany Hotel Co. v. Dingman*, 66 Colo. 306, 308–09, 181 P. 126, 127 (1919), that the "innkeeper's liability does not, however, cease at the very instant a guest leaves the inn." The court went on to recognize that the guest has "a reasonable length of time ... in which to remove his goods, during which period the

extraordinary liability of the innkeeper continues." *Id.* at 309, 181 P. at 127. Given the greater social consequences of personal injury than property damage, this principle should apply here.

¶ 44 *Rodriguez,* on which the district court relied, is distinguishable. There, a minor guest and two adult guests became intoxicated on liquor sold by the defendant hotel and then engaged in disruptive behavior in the hotel. 216 P.3d at 796. They were asked to leave, although one of the adults told hotel personnel that they could not leave but should be allowed to "sleep it off." *Id.* The guests were escorted to their car, where they tried to sleep, but a security guard ordered them out of the parking lot. *Id.* at 796–97. The guests drove away, were involved in a one-car accident, and the minor suffered serious injuries. *Id.* at 797.

¶ 45 The Nevada Supreme Court declined to recognize a duty "to prevent injuries caused by the intoxicated patron that are sustained either by the patron or by third parties after the eviction has been executed." *Id.* at 799. The court reasoned that "[the hotel] did not have the duty to arrange safer transportation, prevent an intoxicated driver from driving, or prevent [the minor], a passenger, from riding with a drunk driver." *Id.* at 800. However, the opinion does not address whether the guests had requested to remain on the premises while they summoned a taxi. Nor does it indicate whether the outside temperature or other weather conditions exposed the guests to any risks. Further, the court considered the hotel's statutory right to evict, which has no analog in Colorado.

¶ 46 In sum, because disputed facts exist as to whether the Westin evicted Groh in a reasonable manner, and its duty to act with ordinary care extended to protect her against reasonably foreseeable harm after she was escorted out of the lobby, that portion of the summary judgment must be reversed.[8]

---

7. The record includes evidence of procedure manuals and other training activities used by the Westin in educating employees on how to deal with intoxicated guests. The record also includes evidence that such practices were the standard in the industry.

8. The conclusion obviates the need to address Groh's reliance on *Justus,* 725 P.2d 767, for the proposition that a factual question exists as to whether the Westin assumed a duty of care to Groh through its advertisements and internal training documents.

### 4. Proximate Cause

¶ 47 Finally, we conclude that proximate cause, which the trial court did not address, cannot be resolved as a matter of law and must be presented to the jury.

¶ 48 "Proximate cause is ordinarily a question of fact for the jury and may be decided as a matter of law only when reasonable minds could draw but one inference from the evidence." *In re Estate of Heckman*, 39 P.3d 1228, 1232 (Colo.App.2001). It is a question of law "only in the clearest cases when the facts are undisputed and it is plain that all intelligent persons can draw but one inference from them." *Moon v. Platte Valley Bank*, 634 P.2d 1036, 1038 (Colo.App. 1981) (quoting *Barker v. Colo. Region Sports-Car Club, Inc.*, 35 Colo.App. 73, 82, 532 P.2d 372, 378 (1974)).

¶ 49 "An actor may be held liable for a plaintiff's injury where the actor was negligent and his negligence constituted a substantial factor in causing plaintiff's injury even where the actor did not and could not foresee the precise manner in which the injury would come about." *Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1062–63 (Colo.1986). And an intervening tortious act of a third party "is not a superseding cause immunizing the defendant from liability, if it is reasonably foreseeable." *Ekberg v. Greene*, 196 Colo. 494, 496–97, 588 P.2d 375, 376 (1978); *compare Estate of Newton v. McNew*, 698 P.2d 835, 837 (Colo.App.1984) (jury could infer foreseeability of intervening event—children spread a fire by playing with embers that construction workers failed to extinguish), *with Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo.App.1998) ("risk that a purchaser would intentionally throw gasoline on a victim and set the victim on fire was not reasonably foreseeable").

¶ 50 Proximate cause may be found where the negligent actor sets in motion a course of events. In *Leppke v. Segura*, 632 P.2d 1057, 1059 (Colo.App.1981), for example, the division held that, when the defendant encountered an intoxicated driver on the side of the road at night and jump-started his car, "a finder of fact could conclude that, by jump-starting an automobile for an obviously drunken driver, thus giving him mobility which otherwise he would not have had, one or both of the defendants set into motion a force involving an unreasonable risk of harm to others ... [warranting] a jury determination of breach of duty." *See also Estate of Newton* (deceased suffered heart attack while fighting fire caused when child "picked up a piece of paper which burned his fingers causing him to throw the paper into the air. The wind blew the paper to a fence separating the construction site from property owned by [deceased] where some weeds and a storage shed caught fire").

¶ 51 Here, according to the record on summary judgment, the Westin's personnel were told by at least one member of Groh's group that they were too drunk to drive. The jury could find it reasonably foreseeable that, after being evicted and denied the opportunity to wait in the lobby for a taxi, Groh would try to get home by car, either driving herself or riding with one of her companions; the driver would encounter a slow-moving vehicle or other hazardous situation; and the driver would be unable to avoid the hazard because of intoxication.

¶ 52 Thus, the jury could conclude that the Westin's acts or omissions set in motion the chain of events that led to Groh's injuries. Because the pre-eviction dialogue included a specific reference to driving after drinking, and the questions—"What do you want us to do?. Where are we supposed to go?"—this inference does not depend on evidence, if any, that before the eviction, the Westin knew Groh had driven to the hotel and parked in the space below, which was connected to the lobby by an elevator.

¶ 53 We disagree with the dissent that proximate cause can be resolved as a matter of law because the collision with a slow-moving vehicle occurred fifteen miles from the hotel. While on different facts lack of proximity might be a litmus test, here that analysis does not warrant taking proximate cause away from the jury because the accident occurred within the distance separating the hotel and Groh's residence, the intended destination.

## IV. Breach of Contract

¶ 54 Groh also contends the trial court erred in ruling, as a matter of law, that she breached her contract with the Westin. She contends the Westin waived any right to claim that she breached its rental contract when she and her group checked into the hotel and the Westin provided her three keys. She has provided no authority, however, and we have found none in Colorado, which indicates that the Westin waived its rights with regard to any persons above that number.

## V. Conclusion

¶ 55 The summary judgment is reversed in part and the case is remanded for further proceedings, limited to Groh's negligence claim. In all other respects, it is affirmed.

JUDGE VOGT * concurs.

JUDGE FURMAN concurs in part and dissents in part.

JUDGE FURMAN concurring in part and dissenting in part.

¶ 56 I respectfully dissent from that portion of the majority's opinion that reverses the district court's grant of summary judgment. In all other respects, I concur.

¶ 57 The majority holds that a hotel has a duty to act reasonably in evicting a guest. I take no issue with such a premise. In adopting Groh's arguments, however, the majority concludes that it is proper to reverse summary judgment in this case because the Westin acted unreasonably during the eviction, which was, therefore, a contributory cause of Groh's injuries. In my opinion, as a matter of law, the facts of this case do not support such a conclusion.

¶ 58 I begin my analysis by discussing what happened after the eviction. Once outside the Westin, Groh used her cell phone to call her brother and inform him of the situation; he advised her to take a taxi home. During this time, one of Groh's friends was looking for a taxi. He asked the first securi-ty guard if the group could wait in the lobby until a cab was procured because of the cold temperatures outside, but the guard crossed his arms and said, "No, get the f* * * out of here."

¶ 59 Groh and the rest of the group then walked along the front of the Westin's building and down a ramp into a parking garage. As Groh and the group walked, they passed several waiting cabs and a taxi stand, but Angela Reed (who had joined the group earlier in the evening shortly after they had checked in) offered to drive. Groh then gave Reed the keys to her PT Cruiser—a vehicle with five seatbelts. Groh and the group (seven persons in all) got into the automobile, and Reed got behind the wheel. Reed was the only person in the car wearing a seatbelt.

¶ 60 Around 4:00 a.m., on northbound I–225, Reed encountered a vehicle that was driving well below the speed limit because it was towing a vehicle with a flat tire. Without braking, she crashed into this vehicle. One passenger died; the others sustained injuries, and Groh sustained severe injuries resulting in a persistent vegetative state. (A toxicology expert later estimated that Reed's blood alcohol content (BAC) was between 0.170 and 0.222 at the time of the accident. The legal BAC limit for driving under the influence is .08.) Reed was subsequently charged with several felonies associated with her driving Groh's vehicle while intoxicated.

¶ 61 As these facts show, it was Groh's actions, in deciding to ride as an unrestrained passenger in the backseat of a car driven by her intoxicated friend instead of taking an available taxi—and in choosing to do so well *after* she was evicted from the Westin—that gave rise to her risk of harm and subsequent injuries. I conclude a reasonable jury could not have found that the Westin could foresee that evicting Groh would give rise to such a risk of harm. Thus, there should be no additional duty imposed on the Westin. Accordingly, I would affirm the district court's summary judgment.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2012.

¶ 62 Summary judgment is appropriate only when the pleadings, affidavits, depositions, answers to interrogatories, or admissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo.1987). "In considering whether the moving party has ultimately established its entitlement to summary judgment, we must grant the non-moving party all favorable inferences that reasonably may be drawn from uncontested facts and resolve any doubt as to whether a triable issue of material fact exists against the moving party." *Ludlow v. Gibbons,* 310 P.3d 130, 135 (Colo.App.2011) (*cert. granted* July 30, 2012) (citing *Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo. 2008)).

¶ 63 Groh contends the district court erred in granting summary judgment in favor of the Westin. She contends that triable issues of material fact exist as to whether the Westin breached its duty of care to her by acting unreasonably during the eviction, basing her position on the following: (1) the innkeeper-guest special relationship; and (2) the assumed duty of care doctrine. I examine each in turn.

### I. The Innkeeper–Guest Special Relationship

¶ 64 Special relationships that have been recognized by various courts for the purpose of imposing a duty of care include the innkeeper-guest relationship. *University of Denver v. Whitlock,* 744 P.2d 54, 58 (Colo. 1987) (citing Restatement (Second) of Torts § 314A); *see also Allen v. Ramada Inn, Inc.,* 778 P.2d 291, 293 (Colo.App.1989).

¶ 65 The innkeeper-guest special relationship does not give rise to the duty urged by Groh and adopted by the majority because (1) her eviction ended the innkeeper-guest relationship and, thus, cannot serve as a basis to impose a duty in this case, and (2) the scope of an innkeeper's duty of care during an eviction is not so broad as to encompass a duty to protect Groh against any injury she might sustain subsequent to the eviction—including injuries sustained nearly an hour after eviction as an unrestrained passenger in a car some fifteen miles from the Westin.

### A. Eviction Ends the Innkeeper Guest Relationship

¶ 66 The majority concludes that the summary judgment should be reversed because the Westin could have told Groh (or her companion, who sought reentry but was barred) "that she could wait in the lobby a reasonable time for a taxi, which it could have called for her." At that point, however, Groh was no longer a guest of the Westin because she had already been evicted.

¶ 67 When an individual ceases to be a guest of a hotel, the special relationship that gives rise to the duty of reasonable care is generally terminated. *See Murray v. Marshall,* 9 Colo. 482, 484, 13 P. 589, 590 (1887); *see also* Restatement § 314A cmt. c. An individual ceases to be a guest once evicted. *See, e.g., Billingsley v. Stockmen's Hotel, Inc.,* 111 Nev. 1033, 901 P.2d 141, 145 (1995).

¶ 68 The statement in *New Albany Hotel Co. v. Dingman,* 66 Colo. 306, 308–09, 181 P. 126, 127 (1919), that an innkeeper's liability does not "cease at the very instant a guest leaves the inn," does not require a hotel to continue the innkeeper-guest relationship beyond eviction. In that case, and other cases addressing the issue, the extraordinary liability of the innkeeper continued because a guest's baggage had been left with the hotel, with the *consent* of a hotel employee and his *understanding* that the baggage would be removed within a reasonable time. *See id.* (baggage left with hotel's "knowledge and consent"); *see also Murray,* 9 Colo. at 485, 13 P. at 590 ("The baggage was left with his consent. . . .").

¶ 69 Accordingly, an innkeeper's consent to keep a guest's baggage after the innkeeper-guest relationship has ended extends the innkeeper's liability for the value of the bags and only for a reasonable time until the bags are removed. *See New Albany Hotel Co.,* 66 Colo. at 308–09, 181 P. at 127. Thus, absent such consent and understanding, Colorado law does not extend an innkeeper's liability beyond the actual eviction. *See id.*

¶ 70 It is undisputed that Groh was a guest of the Westin on the evening in question. But she did not retain that status indefinitely; Groh was lawfully evicted. I agree with the majority that the Westin had a right to terminate its contract with Groh after discovering as many as eleven rowdy people in her hotel room. The Westin exercised that right and evicted Groh, and there is nothing in the record to suggest that it consented to any request made by Groh prior to her eviction that would have extended its liability as an innkeeper beyond the eviction. *See Murray,* 9 Colo. at 484–85, 13 P. at 590. Thus, once Groh was evicted, the innkeeper-guest relationship terminated, and the Westin had no duty to let her or her companions, who were not guests, back into the hotel at that point— assuming she even wanted to reenter. *See id.; see also Billingsley,* 901 P.2d at 145.

¶ 71 Groh also seeks to hold the Westin responsible for her injuries by contending that the Westin "failed to exercise a minimum level of due care" concerning her "health or safety." Specifically, Groh's fourth amended complaint alleged that the Westin failed to take affirmative action to "determine if it was safe for [Groh] to leave [her] hotel room, if there was any alternative shelter available for [Groh] in the proximity of its hotel, or if it was safe for [Groh] to drive home." Groh also contends the Westin could have called the police, but did not.

¶ 72 In my view, Groh's assertions that the Westin failed to take affirmative steps to protect her in her intoxicated state are appropriately characterized as nonfeasance rather than misfeasance. *See Whitlock,* 744 P.2d at 57–59. Nonfeasance exists in cases of "pure failure to act," where the actor may have "had it in its power to take reasonable action to eliminate the peril but had no part in creating it." *Id.* at 59 n.4. The Westin did not contribute to Groh's intoxicated condition and had no part in creating any environmental peril which might have posed a risk to Groh outside the hotel following the eviction.

¶ 73 In situations involving nonfeasance, our supreme court has noted that "the existence of a duty has been recognized only during the last century in situations involving a limited group of special relationships between parties." *Id.* at 58. *Whitlock* made clear that, where negligence based on nonfeasance is alleged, "[i]f ... a duty is to be recognized, it must be grounded on a special relationship" between the parties, *id.* at 59, or a special situation, *id.* at 58 n.3.

¶ 74 As I previously explained, the Westin's decision to evict Groh ended the innkeeper-guest special relationship. Thus, the Westin did not owe Groh a duty based on the special relationship between the parties after that point because, once she was lawfully evicted, the special relationship ended, thereby precluding liability for nonfeasance.

### B. Innkeeper's Duty of Care for Negligent Eviction

¶ 75 Apparently, recognizing that any further analysis must be based on misfeasance, the majority focuses on the affirmative actions of the Westin staff that occurred during the process of the eviction. In so doing, the majority's analysis focuses on whether the Westin performed a reasonable eviction and, as such, apparently recognizes the tort of negligent eviction. I do not disagree that a hotel must evict its guests in a reasonable manner. I cannot agree with the majority's ultimate conclusion, however, for two reasons: (1) I disagree that the scope of a hotel's duty to evict in a reasonable manner is so broad; and (2) I conclude, as a matter of law, that the Westin evicted in a reasonable manner.

### 1. The Scope of an Innkeeper's Duty Is Not So Broad

¶ 76 I first believe that the scope of an innkeeper's duty to effect a reasonable eviction is not so broad as to encompass a duty to protect against speculative injuries which may occur subsequent to eviction—and miles from the hotel.

¶ 77 Colorado appellate courts have previously considered the scope of the duty that innkeepers owe to their guests. In *New Albany Hotel Co.,* 66 Colo. at 308–09, 181 P. at 127–28, our supreme court established that innkeepers owe guests a duty to safeguard the guests' property. In *Rudolph v. Elder,* 105 Colo. 105, 110, 95 P.2d 827, 830 (1939),

our supreme court held that it was "unquestioned as a matter of law that a hotel keeper's duty to keep his premises reasonabl[y] safe for the use of his patrons extends to all portions of the premises to which a guest may be reasonably expected to go." Finally, in *Allen*, 778 P.2d at 293, a division of this court noted that an "innkeeper has a duty to use reasonable care to protect its guests from third persons."

¶ 78 Taken together, these cases demonstrate that the scope of an innkeeper's duty toward its guests includes protecting them from injuries which may occur at the hotel. Before today, no Colorado appellate court has considered whether an innkeeper is under a duty to protect an evicted guest from speculative injuries that may occur subsequent to eviction and miles from the hotel's premises. For the reasons stated below, I see no adequate reason to depart from our firmly established precedent and expand the scope of the innkeeper's liability to encompass such a duty.

¶ 79 Defining the scope of an innkeeper's duty of care to include a duty to protect its guest while on the hotel's premises is a logical limit to its duty of care. A hotel has the right and ability to control its premises. It can take action to ensure that its premises are safe for its patrons. It can also, if necessary, take measures to mitigate the risk of reasonably foreseeable criminal acts by third persons. When accidents occur subsequent to eviction beyond the hotel's premises, however, the innkeeper's ability to mitigate potential harm is severely limited. *See, e.g., Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 80 P.3d 35, 39 (2003) ("The ... proprietor will have no control over the premises where the accident occurs, no ability or right to remedy any defect, and no control over the actions or risks undertaken by his customer.") (quoting *Mostert v. CBL & Assocs.*, 741 P.2d 1090, 1104 (Wyo. 1987) (Cardine, J., dissenting)). And while it is true that hotels have the ability to control whether an evicted guest can remain on the premises, or later reenter, it makes little practical sense to justify expanding the scope of the innkeeper's duty to evicted guests on these grounds.

¶ 80 Indeed, other jurisdictions which have examined reasonable care during hotel evictions have concluded that a hotel is within its rights to evict a patron from the premises provided no more force is used than is necessary. *See, e.g., Rodriguez v. Primadonna Co.*, 125 Nev. 578, 216 P.3d 793, 796 (2009). And neither case cited by the majority as "well-reasoned" for the principle that hotels have a duty to effectuate a reasonable eviction delineated such an expansive scope of duty as that proposed by the majority. *See id.* at 799 (scope of duty limited to a prohibition against unreasonable force in ejecting patron, noting a hotel has no duty "to prevent injuries caused by the intoxicated patron that are sustained either by the patron or by third parties after the eviction has been executed"); *see also Raider v. Dixie Inn*, 198 Ky. 152, 248 S.W. 229, 230 (1923)(where alleged injury occurred during eviction, court considered whether the hotel employed unlawful means to exclude the patron).

¶ 81 A brief analysis of other factors used to determine the scope of a common law duty, *see, e.g., Whitlock*, 744 P.2d at 57, further supports my conclusion that the scope of an innkeeper's duty should not be expanded under the facts presented here. The risk involved in requiring a former guest to leave the hotel under the circumstances presented here is that the guest may injure herself or be injured off the premises. The foreseeability or likelihood of such injury "requires excessive speculation ... here," *Casebolt v. Cowan*, 829 P.2d 352, 368 (Colo.1992) (Rovira, C.J., dissenting), where Groh was injured, not by her own drunk driving or by the cold weather, but several miles away from the hotel as a passenger—who was not wearing a seatbelt—in a car accident.

¶ 82 In this case, the Westin had no reason to foresee that evicting Groh under the circumstances presented here would result in an unreasonable risk of harm. Even assuming Groh was actually intoxicated at the time of eviction, Groh did not appear intoxicated to Westin personnel. Neither did the Westin know that Groh's vehicle was parked in the adjacent parking garage. Further, any analysis of whether it was reasonably foreseeable that the environment outside the hotel posed

a risk to Groh is simply an exercise in speculation and, I believe, not relevant. The parties never argued that the Westin's duty to Groh turned on the "environment" outside the hotel and the appellate record is essentially devoid of facts on this issue.

¶ 83 Considering the social utility of the Westin's activities, it is very useful for hotels to evict guests that violate their policies without having to consider every nuance which could possibly lead to harm outside the hotel's walls. Moreover, allowing hotels to perform evictions without having to involve the police in every situation, which the majority suggests might avoid breach of duty, also promotes efficiency—especially where, as in this case, the facts do not suggest that Groh herself was assaultive or threatening.

¶ 84 Finally, in my view, placing the type of duty on hotels that Groh urges would be an excessive burden. The majority argues that the burden on innkeepers to carry out this duty would be "relatively inexpensive." This assertion is factually unsupported by the record. Moreover, imposing such a duty to an evicted former guest could directly contravene the Westin's clearly established duty to use reasonable care to protect its guests from third persons on its premises. *See Allen*, 778 P.2d at 293 ("[T]he innkeeper has a duty to use reasonable care to protect its guests from third persons.").

¶ 85 While a hotel may be able to reconcile these competing duties in some situations, such as the majority suggests a jury might find here, this would certainly not be the case in all situations. *See, e.g., Rodriguez*, 216 P.3d at 796 (evicted guest engaged in disruptive behavior on premises, including assaulting another guest). Where a hotel has the ability to prevent such criminal acts by simply evicting the offenders peacefully, I believe it would be an excessive burden to impose a duty that would prevent hotels from doing so.

### 2. The Westin Did Not Evict Groh in an Unreasonable Manner

¶ 86 Next, the majority concludes that summary judgment was not appropriate because "the disputed facts and favorable inferences ... preclude finding, as a matter of law," that the Westin evicted Groh "in a reasonable manner." I respectfully disagree.

¶ 87 As noted, I do not dispute that hotels must act reasonably when evicting (both guests and trespassers alike) by not using unreasonable force. *See Rodriguez*, 216 P.3d at 796. Because it is undisputed that the Westin did not use physical force in evicting Groh, I believe it could not have acted unreasonably in doing so.

¶ 88 Further, I disagree with the majority's conclusion that the Westin was unreasonable when evicting Groh because it evicted her "into foreseeably dangerous circumstances resulting from either [Groh's] condition or the environment." There is simply no record evidence to support such an inference.

¶ 89 The majority contends that Groh's intoxicated condition (and that of her companions) created a foreseeably dangerous condition because intoxicated individuals, as a class, suffer from impairment of both physical abilities and judgment. Despite the fact that I disagree with the premise that voluntary intoxication of an evicted guest should impose additional duties on a hotel when evicting, the majority's conclusion relies on a generalization of all intoxicated persons without taking into account the undisputed facts in this case. The majority has not demonstrated how the record supports the conclusion that Groh herself was suffering from such impairment. Indeed, the undisputed facts in the record indicate that Groh did not appear intoxicated to Westin personnel, she called her brother and carried on a rational conversation with him, and even debated with the hotel security about her options short of eviction.

¶ 90 My conclusion is the same when the facts surrounding the environment, viewed in the light most favorable to Groh, are analyzed. The majority speculates that the late hour and winter season might have exposed Groh to a foreseeable risk of injury. Even if this was relevant, however, this inference is unsupported by record evidence; Groh did not introduce evidence regarding the temperature outside, or whether she was even cold.

¶ 91 Because, in this summary judgment case, the majority is basing much of its deci-

sion on facts and arguments never raised by the parties, and because I believe the undisputed facts raised by the parties do not show the Westin evicted Groh into foreseeably dangerous circumstances, I conclude, as a matter of law, that the Westin was not unreasonable in its eviction of Groh.

## II. Assumption of Duty

¶ 92 Groh also contends that the Westin is responsible for her injuries under the assumed duty of care doctrine. *See Whitlock*, 744 P.2d at 58 n.3 (citing Restatement § 314 cmt. a). Under this doctrine, "a party may assume duties of care by voluntarily undertaking to render a service." *Jefferson County Sch. Dist. R–1 v. Justus*, 725 P.2d 767, 770 (Colo.1986); *see also Wark v. United States*, 269 F.3d 1185, 1189 (10th Cir.2001).

¶ 93 For the doctrine to apply, however, Groh must first show that the Westin "undertook to render a service that was reasonably calculated to prevent the type of harm that befell [her]." *Jefferson County Sch. Dist. R–1*, 725 P.2d at 771. Groh must then show either that she "relied" on the Westin "to perform the service" or that the Westin's "undertaking increased [her] risk." *Id.* The scope of this assumed duty "must be limited to the performance with due care of that service undertaken." *Id.* at 772 n.5. Liability under a voluntarily assumed duty, however, "can obviously be no broader than the undertaking actually assumed." *Id.*

¶ 94 Groh contends the Westin assumed a duty "to protect [her] while [she was] intoxicated and to prevent [her] from driving while intoxicated." Although it was undisputed that Groh was not driving, she nevertheless argues that the Westin assumed a duty to protect her from her intoxicated friend's driving because of (1) the Westin's advertisements that the hotel was in close proximity to bars and restaurants downtown, (2) the Westin's internal training documents, which show that it generally pays for alternative transportation in order to prevent intoxicated guests from driving, and (3) deposition testimony of the Westin's employees admitting that the Westin will pay for a taxi.

¶ 95 I conclude, however, that the record does not contain evidence demonstrating that the scope of this assumed duty is so broad as to include preventing a former guest from being injured while riding as a passenger without a seatbelt in her car driven by an intoxicated friend. Indeed, it was Groh's action of choosing to become a passenger in a car driven by an intoxicated friend that created and gave rise to Groh's risk and subsequent injury. *See, e.g., Smith v. City & County of Denver*, 695 P.2d 770, 771–72 (Colo.App.1984), *aff'd*, 726 P.2d 1125 (Colo. 1986). Simply put, Groh has provided no evidence demonstrating the Westin undertook a service that was reasonably calculated to prevent her from being injured as a passenger in a car driven by a third party.

¶ 96 Additionally, as noted, Groh must show "either that [she] relied on the [Westin] to perform the service or that [the Westin's] undertaking increased [her] risk." *Jefferson County Sch. Dist. R–1*, 725 P.2d at 771. Groh has not presented any evidence that she relied on the Westin's advertisements or training documents. Indeed, she has not presented any evidence that she even knew of their existence at the time she checked into the hotel room.

¶ 97 Moreover, there is also no evidence that the Westin's undertaking placed Groh in a more vulnerable position than she would have been in had the Westin taken no action at all. *See id.* at 772. I point out, however, that following the eviction, Groh and her group left on foot. She had a conversation with her brother who advised her to take a cab. She and the group walked past several waiting cabs and a taxi stand as they left the premises. She did not drive away from the Westin. Instead, she entrusted her vehicle to a member of her group with whom the Westin had no contact and no legal relationship whatsoever.

¶ 98 To the extent that Groh argues that protecting against the injuries she received while riding as an unrestrained passenger was within the scope of the alleged assumed duty of the Westin, the record shows that Groh and her group declined the alternative transportation and instead made a subsequent series of poor choices which led to the accident. The Westin had no mechanism to

force the group to take alternative transportation even if its employees had reason to suspect that the entire group was intoxicated—a suspicion which, the record reveals, did not exist.

¶ 99 Because Groh has not cited any evidence indicating that the Westin "either through its affirmative acts or through a promise to act, undertook to render a service that was reasonably calculated to prevent the type of harm that befell [her]"—that she was injured in an accident while riding without a seatbelt as a passenger in a car driven by an intoxicated driver—I conclude the Westin did not assume a duty of care toward Groh. *Id.* at 771.

¶ 100 Accordingly, I would affirm the district court's grant of summary judgment.

### III. Proximate Cause

¶ 101 In the alternative, I conclude summary judgment may also be affirmed because no reasonable jury could conclude that the Westin's breach was the proximate cause of Groh's injuries.

¶ 102 Before turning to the merits of this issue, I first address whether the issue of proximate cause is properly before us on appeal. The district court did not reach the issue of proximate cause in awarding summary judgment in favor of the Westin, despite its being raised and briefed by the parties, because the court concluded the Westin did not owe a duty to Groh. Groh did not raise the issue of proximate cause on appeal. The Westin raised the issue but did not file a cross-appeal in this matter. Nonetheless, I conclude reaching the issue is proper.

¶ 103 Without filing a cross-appeal, "an appellee may ... raise arguments in support of his judgment which would not increase his rights under the judgment, whether or not the trial court has ruled on those arguments." *Blocker Exploration Co. v. FrontierExploration, Inc.,* 740 P.2d 983, 989 (Colo. 1987) (quoting *City of Delta v. Thompson,* 37 Colo.App. 205, 208, 548 P.2d 1292, 1294–95 (1975)). Because the Westin's proximate cause argument would support the district court's grant of summary judgment as to

Groh's negligence claim, without increasing the Westin's rights under the judgment, I consider it now, despite the Westin's failure to file a cross-appeal. *See id.*

¶ 104 To prevail on a claim of negligence, just as a plaintiff must show that a defendant owed her a duty, "a plaintiff [also] must show that the defendant's alleged negligence proximately cause the claimed injury." *Reigel v. SavaSenior Care L.L.C.,* 292 P.3d 977, 985 (Colo.App.2011).

¶ 105 "[T]he question of proximate cause is ordinarily one of fact for the jury...." *Walcott v. Total Petroleum, Inc.,* 964 P.2d 609, 612 (Colo.App.1998) (citing *Samuelson v. Chutich,* 187 Colo. 155, 529 P.2d 631 (1974)). It may be decided as a question of law, however, when reasonable minds could draw but one inference from the evidence. *Id.*

¶ 106 The majority concludes that "[p]roximate cause may be found where the negligent actor sets in motion a course of events." This is not the case, however, when the course of events is disrupted by an independent intervening cause.

> A defendant's conduct is not a cause of another's injuries if, in order to bring about such injuries, it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which intervening cause would not have been reasonably foreseen by a reasonably careful person under the circumstances.

*Moore v. Western Forge Corp.,* 192 P.3d 427, 436 (Colo.App.2007) (quoting *Scharrel v. Wal–Mart Stores, Inc.,* 949 P.2d 89, 93 (Colo. App.1997)).

¶ 107 Apparently acknowledging the law on intervening cause, the majority contends that a jury could find it reasonably foreseeable that the subsequent events would unfold as they did because "the Westin's personnel were told by at least one member of Groh's group that they were too drunk to drive." I do not think that this fact could lead a reasonable jury to conclude that the Westin knew, or should have known, Groh or her companions would, in fact, do the opposite, attempt to drive drunk, and then later en-

counter a slow-moving vehicle on the highway.

¶ 108 Instead, I conclude no reasonable jury could find the Westin's acts or failure to act caused Groh to be injured in the car accident. Another look at the chain of events illustrates my point:

- As conceded for the purposes of summary judgment, the Westin evicted Groh;
- The Westin provided a taxi stand and several taxis were parked outside when Groh exited the hotel;
- Members of Groh's group told the Westin they were seeking a cab;
- Angela Reed volunteered outside of the Westin to drive Groh home;
- Groh chose not to take a taxi and, instead, chose to entrust her vehicle to Reed;
- Groh chose to board her PT Cruiser, a vehicle with five seat belts, with six others in such a way as to prevent her from wearing a seat belt;
- The exit to the parking structure was barricaded, and Reed drove around the barricade to exit;
- Reed drove the vehicle several miles without incident;
- Reed then came upon a vehicle that was driving approximately eight miles per hour on the highway;
- The slow-moving vehicle was following behind a vehicle being driven with a flat tire;
- Reed also "wasn't paying attention" and was "watching Groh and [a male companion] in the rearview mirror at the time of the crash";
- Approximately an hour after being evicted from the Westin, Reed collided with the slow-moving vehicle and Groh was injured as a result.

¶ 109 The result in *Dagen v. Marriott International, Inc.,* (N.D.N.Y. No. 1:05CV 1593, Apr. 16, 2008) (unpublished memorandum-decision and order), a federal district court case on which the majority extensively relies, reinforces my point. There, the court denied the hotel's motion to dismiss for failure to state a claim under Fed.R.Civ.P.

12(b)(6) but later granted the hotel's motion for summary judgment in part based on a lack of proximate cause. *Id.* at *6.

¶ 110 After the plaintiff was evicted from his hotel, he boarded his vehicle and drove approximately ninety miles. *Id.* at *2. The plaintiff was injured when he reached a slippery part of the road, lost control, and skidded off the exit ramp, hitting a tree. *Id.* It was undisputed that the plaintiff was traveling at an unsafe speed for the road conditions. *Id.* Considering these facts, the court explained:

> Although it is true that "but for" his eviction from the hotel, Plaintiff would not have been on the exit ramp that night, the eviction merely furnished the condition or occasion for the occurrence of the accident. Defendants' eviction of Plaintiff cannot be considered to be the proximate cause of Plaintiff's tires losing grip with the road and his skidding off the exit ramp three hours later.... Plaintiff's injuries were caused by a slick spot on the exit ramp which he approached at an unsafe speed, and which caused him to lose control of his car. Any alleged negligence by the Defendants was not a proximate cause of his injuries.

*Id.* at *6.

¶ 111 Although it may be true that "but for" her eviction from the Westin, Groh may not have been on the highway that night, the eviction did not cause Groh's accident. Groh was injured as a passenger in a car accident after Reed, who was driving while intoxicated and not paying attention to the road, encountered a vehicle driving well under the speed limit and collided with that vehicle. No reasonably careful person under the circumstances would have reasonably foreseen that such events would have unfolded once Groh left the hotel. *See Moore,* 192 P.3d at 436. Accordingly, under the facts presented here, I conclude, as a matter of law, that the Westin's acts were not the legal cause of Groh's injuries. *See Walcott,* 964 P.2d at 612. Thus, I would also affirm summary judgment on these grounds. *See, e.g., Newflower Market, Inc. v. Cook,* 229 P.3d 1058, 1061 (Colo.App.2010) ("If the trial court reached the correct result, we may affirm its

determination on different grounds.") (citing *Barham v. Scalia,* 928 P.2d 1381 (Colo.App. 1996)).

## IV. Conclusion

¶ 112 I conclude by expressing my concern over the implications of the opinion announced today. This was an undeniably tragic case. The majority's imposition of a duty on the Westin under the facts of this case, however, is a great expansion of tort duty in Colorado. Hotels will now have an expanded duty to protect evicted guests, and I fail to see any distinction in the majority's reasoning which will prohibit such a duty from being expanded to any business owner. While the majority states that hotel guests are not merely invitees, the majority provides no logical distinction why the opinion must be limited to its facts or apply only to hotels.

¶ 113 The majority has recognized a duty so broad as to encompass all potential injuries an evicted former guest (who may or not be intoxicated) may suffer after leaving the premises. If Groh and her group had used a taxi that was later in an accident, would the Westin still be liable for those injuries?

¶ 114 Additionally, because the finding of duty is essentially an expression of policy, I believe the majority's opinion frustrates the clear public policy statement of the legislature that "where an individual makes a deliberate choice to drink alcohol, that individual should also be responsible if that choice results in negligence." *Casebolt,* 829 P.2d at 367–68 (Rovira, C.J., dissenting) (citing *Charlton v. Kimata,* 815 P.2d 946, 951 (Colo. 1991)). Today, the majority states that Groh's choice to drink alcohol provides her with additional protection, and the Westin additional liability,

because there was a possibility she could have been injured by her actions while intoxicated. I believe that this expression of policy is in contravention of public policy expressed by our legislature in the Dramshop Act, and I note that other jurisdictions with similar statutes have come to the same conclusion when presented with similar facts. *See, e.g., Rodriguez,* 216 P.3d at 799 ("[I]n accordance with the principles underlying Nevada's rejection of dram-shop liability, we conclude ... the hotel proprietor is not required to consider a patron's level of intoxication in order to prevent speculative injuries that could occur off the proprietor's premises.").

¶ 115 For these reasons, I respectfully dissent.