2015 CO 25

**WESTIN OPERATOR, LLC, Petitioner**

**v.**

**Jillian GROH, individually, and by and through her guardians and conservators, William Groh and Janelle Groh, Respondents.**

**Supreme Court Case No. 13SC382**

Supreme Court of Colorado.

April 13, 2015

Rehearing Denied May 11, 2015

𝒪⟶1713

Attorneys for Petitioner: The Waltz Law Firm, Richard A. Waltz, John D. Halepaska, Denver, Colorado

Attorneys for Respondents: Law Offices of Alan C. Shafner, Alan C. Shafner, Greenwood Village, Colorado, Law Offices of John F. Poor, John F. Poor, Denver, Colorado

Attorneys for Amicus Curiae Colorado Defense Lawyers Association: Ruebel & Quillen, LLC, Casey A. Quillen, Westminster, Colorado

Attorneys for Amicus Curiae Colorado Trial Lawyers Association: Roberts Levin Rosenberg PC, Michael J. Rosenberg Denver, Colorado

JUSTICE HOOD delivered the Opinion of the Court.

¶ 1 This case raises an issue of first impression for this court: What duty of care, if any, does a hotel owe to a guest during a lawful eviction?

¶ 2 After a late night out in downtown Denver, Jillian Groh brought a group of friends back to a room she had rented at the Westin Hotel. Security guards confronted the group about the noise level in the room and ultimately evicted them, even though Groh and her companions advised the guards that they were drunk and could not drive. On the way out, one of Groh's friends asked a guard if the group could wait in the lobby for a taxicab because it was freezing outside. The guard responded by blocking the door and saying, "No, get the f* * * out of here." Seven people got into Groh's car, with a drunk driver behind the wheel. Fifteen miles away, they rear-ended another vehicle, resulting in a crash that killed one man and left Groh in a persistent vegetative state with traumatic brain injuries.

¶ 3 Groh's parents seek to hold the Westin liable for their daughter's injuries because of the manner in which its security guards evicted her. A divided court of appeals held

that a hotel has a duty to evict a guest "in a reasonable manner," noting that this precludes ejecting a guest into "foreseeably dangerous circumstances" that result from either the guest's condition or the environment. *See Groh v. Westin Operator, LLC*, 2013 COA 39, ¶ 1, —— P.3d ——. It also held that the Colorado Dram Shop Act did not apply because the hotel did not serve alcohol to Groh. *Id.* at ¶ 17 n.3. We granted certiorari to consider: (1) whether the Westin owed any duty of care to Groh in connection with her eviction and, if so, whether a reasonable jury could find a breach of that duty based on the evidence submitted in relation to the Westin's summary judgment motion; and (2) whether the Dram Shop Act applies to this case.

¶ 4 Based on the special relationship that exists between an innkeeper and guest, we hold that a hotel that evicts a guest has a duty to exercise reasonable care under the circumstances. This requires the hotel to refrain from evicting an intoxicated guest into a foreseeably dangerous environment. Whether a foreseeably dangerous environment existed at the time of eviction depends on the guest's physical state and the conditions into which he or she was evicted, including the time, the surroundings, and the weather. In this case, genuine issues of material fact preclude summary judgment on Groh's claims of negligence and negligent hiring and training. We also hold that the Dram Shop Act does not apply in this case because it is undisputed that the Westin did not serve alcohol to Groh. Consequently, we affirm the judgment of the court of appeals and remand for further proceedings.

## I. Facts

¶ 5 On Saturday, March 3, 2007, Jillian Groh registered as a guest at the Westin at the Tabor Center in Denver. Groh's sister used her employee discount to rent the room only for Groh; however, Groh checked in with two friends, and all three of them received their own room keys. The women then went out to several downtown nightclubs.

¶ 6 Later that night, at about 2:00 a.m., the women returned to the Westin and brought five to eight additional people back to their room. (The parties dispute the exact number.) The hotel room had a mini-bar with alcohol, but no one in the group drank any of it. Although multiple nearby rooms were occupied, no other guests complained about noise. Still, the group captured the attention of a Westin security guard, who summoned another Westin security guard as well as the guest services manager–supervisor. Around 2:45 a.m., a heated confrontation between the Westin's security guards and the occupants of the room occurred. Some members of Groh's group became boisterous and argumentative. Ultimately, hotel security told everyone except the registered guests to leave the premises; Groh refused to stay without her friends. For the purpose of the summary judgment motion at issue here, the Westin concedes it evicted Groh as well.

¶ 7 At least one person told the security guard that everyone in the group was "drunk," that the "whole purpose" of renting the room was to allow them to drink without driving, and that they could not leave because, "We are drunk. We can't drive." While these discussions took place, several members of the group left separately; thus, they were not involved in the events that followed. The security guards escorted Groh and the remaining members of the group outside. Police officers happened to be on the hotel premises investigating a separate, unrelated incident. The Westin employees did not seek police intervention with Groh or her friends.

¶ 8 Groh called her brother for advice, and he told her to call a cab. She did not heed his advice. Video footage from hotel security cameras shows two taxis in the vicinity during the general timeframe of the eviction. No taxi is visible on screen during the time in which the group exited the hotel and walked to the parking lot en masse, but there is a police car parked at the entrance. It is unclear from the record whether the taxis visible at other times in the video were occupied or available for service, whether any member of the group saw the taxis, and whether the security guards evicting the group were aware if a taxi was immediately available. One of the people evicted testified

at his deposition that he tried to look for a cab outside the hotel but did not see one. That person also testified that he asked if the group could wait in the lobby while they called a taxi because it was freezing outside. The security guard refused his request, blocked the door to bar re-entry, and told him, "No, get the f* * * out of here." A second person from the group testified that she did not see any taxis in front of the hotel at any time when they exited the building. A third person from the group testified that he did not know there was a cab stand outside the Westin.

¶ 9 The Westin's security guard watched the group walk to the nearby parking garage. At about 3:20 a.m., seven people loaded into Groh's self-parked car, a PT Cruiser designed for up to five passengers. Only the driver, Angela Reed, buckled up.

¶ 10 At about 4:00 a.m., en route to one passenger's home, they were involved in an accident on Interstate 225, about fifteen miles from the Westin. Reed, whose blood alcohol content ("BAC") was above the legal limit,[1] drove at an excessive speed—about seventy-five miles per hour in a fifty-five mile-per-hour zone. She rear-ended a Ford Expedition that was traveling well below the speed limit and illegally towing another vehicle with a flat tire in the right-hand lane. One passenger in Groh's car was killed. Others were badly injured. Groh sustained traumatic brain injuries.

## II. Procedural History

¶ 11 Through her parents, Groh sued the Westin for negligence, premises liability, breach of contract, and negligent hiring and

training. Only the negligence-related claims are before us now.[2]

¶ 12 In support of her negligence claim, Groh alleges that the Westin "failed to exercise a minimum level of due care" concerning her safety when it evicted her and her companions "with full knowledge" that they "had been drinking and were visibly intoxicated." She also asserts that the Westin "made no effort to determine if it was safe" for Groh and her companions to leave their hotel room, if any alternative shelter was available, or if it was safe for them to drive home.

¶ 13 In support of her negligent hiring and training claim, Groh alleges that the Westin was negligent in hiring the employees who evicted Groh and her companions—particularly its security guards and night manager—because the Westin "knew or should have known, at the time of hiring," that the employees' conduct would subject third persons to an unreasonable risk of harm. Likewise, she asserts that the Westin failed to properly train those employees regarding how to attend to intoxicated guests.

¶ 14 The Westin filed a motion for summary judgment which conceded, for the purpose of the motion only, "that the Westin evicted the occupants of the room and required them to leave the premises." The trial court granted the motion with respect to the negligence-based claims because it concluded that the Westin did not owe Groh a duty of care.[3]

¶ 15 Groh filed a motion to reconsider, which the trial court denied. The court shifted its position on duty, however, when it agreed "that innkeepers owe a duty of reasonable care in conducting evictions." By

---

**1.** The parties dispute the exact level of Reed's BAC at the time of the accident. However, Groh's medical toxicology expert, Ken Kulig, M.D., estimated that it was .20 at 2:00 a.m. and .17 at 4:00 a.m.—more than three times the .05 permissive inference for driving while ability impaired ("DWAI").

**2.** Since its inception in 2008, this case has evolved significantly. The trial court consolidated cases stemming from the same factual scenario. Some claims settled or were dismissed, such that certain plaintiffs and defendants are no longer parties to the lawsuit—including two other passengers in Groh's vehicle (formerly plain-

tiffs), Reed (formerly a defendant), several bars that served Reed (formerly defendants), and the owner and tower of the disabled vehicle involved in the accident (formerly defendants).

**3.** The trial court also dismissed (1) the premises liability claim under section 13–21–115(2), C.R.S. (2010), because that statute, by its terms, applies only when a plaintiff is injured on the defendant's property, and Groh was injured off-premises; and (2) the breach of contract claim because Groh breached the contract when she allowed additional people into her room. Again, these claims are not at issue in this appeal.

way of example, it noted that "hotel employees cannot so manhandle guests as to cause them injury" and that "any time [people] take[ ] affirmative action, they must use reasonable care." But it found, as a matter of law, that the Westin did not cause damages to Groh during the course of the eviction and had no duty to take affirmative steps to determine the extent of a guest's intoxication, move a guest to another room, call or pay for a taxi, request police intervention, or ensure that evicted, intoxicated guests do not leave in a self-operated vehicle.

¶ 16 The court of appeals initially affirmed the summary judgment order. Judge Furman authored the first opinion, Judge Russel concurred, and Judge Webb dissented. The court held that the Westin did not owe a duty of care to Groh because the innkeeper–guest special relationship terminated upon her eviction. The court also declined to impose a duty under the assumed duty of care doctrine because the Westin did not undertake to provide a service that was reasonably calculated to prevent the type of harm that befell Groh and did not place her at an increased risk.

¶ 17 Groh filed a petition for rehearing, which the court of appeals granted. The panel's composition changed when Judge Vogt replaced Judge Russel, who retired. The revised panel withdrew the first court of appeals opinion and reversed the summary judgment order with respect to the negligence-related claims. Judge Webb then authored the majority opinion, Judge Vogt concurred, and Judge Furman concurred in part and dissented in part. The court held that "a hotel must evict a guest in a reasonable manner, which precludes ejecting a guest into foreseeably dangerous circumstances resulting from either the guest's condition or the environment." *Groh*, ¶ 1. It then deemed summary judgment inappropriate because a reasonable jury could find a breach of this duty based on the record in this case. *Id.* We granted certiorari review.

### III. Standard of Review

¶ 18 Whether a defendant owes a legal duty to a plaintiff is a question of law. *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987); *accord HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002) (explaining that the existence and scope of a duty is a question of law for the court).

¶ 19 A trial court's order granting or denying summary judgment is subject to de novo review. *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1218 (Colo.2002). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c).

¶ 20 The moving party bears the initial burden of showing no genuine issue of material fact exists; the burden then shifts to the nonmoving party to establish a triable issue of fact. *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 736 (Colo.1991). All doubts must be resolved against the moving party; at the same time, the nonmoving party "must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts." *Tapley v. Golden Big O Tires*, 676 P.2d 676, 678 (Colo.1983).

¶ 21 Summary judgment is "a drastic remedy, to be granted only when there is a clear showing that the controlling standards have been met." *HealthONE*, 50 P.3d at 887–88; *Casebolt v. Cowan*, 829 P.2d 352, 363 (Colo.1992) (emphasizing that summary judgment "is appropriate only in the clearest of cases"). Even where it is "extremely doubtful" that a genuine issue of material fact exists, summary judgment is inappropriate. *Mancuso*, 818 P.2d at 736 (quoting *Abrahamsen v. Mountain States Tel. & Tel. Co.*, 177 Colo. 422, 494 P.2d 1287, 1290 (1972)).

### IV. Analysis

¶ 22 For the first time, we consider what duty of care, if any, a hotel owes to a guest during a lawful eviction. We answer this question by examining the special relationship that exists between innkeepers and guests, which is similar to the relationship between common carriers and their passen-

gers. We then analyze the factors that support the imposition of a duty, as articulated in *HealthONE*. After finding a duty, we discuss its scope and then address whether summary judgment is appropriate.

## A. Duty

¶ 23 To prevail on her negligence claims, Groh must prove: (1) that the Westin owed her a legal duty of care; (2) that the Westin breached that duty; (3) injury to herself; and (4) causation. *HealthONE*, 50 P.3d at 888. A plaintiff must establish the same basic elements for a negligent hiring and training claim, which is based on the principle that a person or business conducting an activity through employees is subject to liability for harm that results from negligent conduct in employing those persons. *See Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1015–17 (Colo.2006); *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320–23 (Colo.1992); *see also Keller v. Koca*, 111 P.3d 445, 448 (Colo.2005) ("To establish liability, the plaintiff must prove that the employer has a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known that the employee would cause harm.").

¶ 24 We first assess duty. *See HealthONE*, 50 P.3d at 888 ("[T]he initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury."); *Whitlock*, 744 P.2d at 56 ("A negligence claim must fail if based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff.").

¶ 25 Duty is " 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection.' " *Whitlock*, 744 P.2d at 57 (quoting W. Page Keeton, *Prosser and Keeton on Torts* § 53, at 358 (5th ed. 1984)); *see also Observatory Corp. v. Daly*, 780 P.2d 462, 466 (Colo.1989) (characterizing the determination of duty as the exercise of a court's "prudential judgment"). The guiding principle is "fairness under contemporary standards." *HealthONE*, 50 P.3d at 888 (quoting *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo.1993)). We ask: "[W]ould reasonable persons recognize and agree that a duty of care exists"? *Greenberg*, 845 P.2d at 536. In deciding whether a duty exists, we have traditionally examined (1) the nature of the relationship between the parties and (2) a particular set of public policy factors. Either or both may confer a duty or inform the scope of the duty. We examine each in turn.

### 1. The Innkeeper–Guest "Special Relationship"

¶ 26 This court and successive versions of the Restatement of Torts have long recognized the innkeeper–guest relationship as a "special" one, conferring a duty to exercise reasonable or ordinary care under the circumstances and giving rise to an affirmative duty to aid or protect.

¶ 27 This court's first pronouncement on this topic occurred in *Burchmore v. Antlers Hotel Co.*, 54 Colo. 314, 130 P. 846, 847 (1913). The plaintiff in *Burchmore* was injured during a hotel stay when a makeshift dining room chair collapsed during dinner. *Id.* at 846. This court implicitly treated the innkeeper–guest relationship as special when it stated that a hotel's use of reasonable care is the proper benchmark for evaluating a negligence claim. *See id.* at 848.

¶ 28 More recently, in *University of Denver v. Whitlock*, this court observed that the innkeeper–guest relationship falls within the group of "[s]pecial relationships that have been recognized by various courts for the purpose of imposition of a duty of care." 744 P.2d at 58. *Whitlock* involved neither a hotel nor a guest; instead, a student sued the university for injuries sustained in a trampoline accident on land that a fraternity leased from the school. *Id.* at 55. However, we focused extensively on the types of relationship in which a duty arises. *Id.* at 56–59. We also made clear that, when a special relationship exists, liability can result both from misfeasance (active misconduct causing a positive injury to others) or nonfeasance (passive inaction or a failure to protect from harm). *Id.* at 57–58.

¶ 29 We observed in *Whitlock* that the law appears "to be working slowly" toward recognizing a duty to aid or protect those in a dependent or mutually dependent relationship. *Id.* at 58. We cited with approval section 314A of the Restatement (Second) of Torts, *see id.*, which states that an innkeeper "is under" the following duty to its guests: "(a) *to protect them against unreasonable risk of physical harm,* and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and *to care for them until they can be cared for by others.*" Restatement (Second) of Torts § 314A (1965) ("Special Relations Giving Rise to Duty to Aid or Protect") (emphasis added).[4]

### 2. Common Carrier Similarity

¶ 30 An innkeeper's duty is consistent with the duty that has been imposed in another context in which we have recognized a special relationship—common carriers and their passengers. *See Whitlock,* 744 P.2d at 58 (listing "common carrier/passenger" as a special relationship for which courts have imposed a duty of care). A common carrier may be liable for injuries caused when it exercises its right to eject a passenger "at a time or place which is dangerous." *McCoy v. Millville Traction Co.,* 83 N.J.L. 508, 85 A. 358, 360 (N.J.1912); *accord Brown v. Chi., Rock Island & Pac. R.R. Co.,* 51 Iowa 235, 1 N.W. 487, 490 (1879) (explaining that whether a carrier exercised care during an ejection depends on factors such as the passenger's physical condition, the time, the surroundings, and the weather); *Commerce Ins. Co. v. Ultimate Livery Serv., Inc.,* 452 Mass. 639, 897 N.E.2d 50, 57 (2008) (holding that a common carrier owes a duty of reasonable care to avoid discharging a passenger who it knew, or should have known, was intoxicated and likely to drive an automobile); *Kelleher v. F.M.E. Auto Leasing Corp.,* 192 A.D.2d 581, 596 N.Y.S.2d 136, 137–39 (1993) (discussing the risks of ejecting an intoxicated passenger into the snow); *Tex. Midland R.R. Co. v. Geraldon,* 54 Tex.Civ.App. 71, 117 S.W. 1004, 1007 (1909) (holding that a carrier's

right to eject a passenger "must be exercised in a proper manner and at the proper time and place"), *aff'd,* 103 Tex. 402, 128 S.W. 611 (1910); *Bragg's Adm'x v. Norfolk & W. Ry. Co.,* 110 Va. 867, 67 S.E. 593, 595 (1910) (stating that a railroad company ejecting a drunk passenger must consider the weather conditions and the place of ejection, together with the passenger's intoxicated condition).

¶ 31 "The rules of law, as well as the dictates of humanity, require that the ejection shall occur at such place, and be conducted in such manner, as not unreasonably to expose the party to danger." *Brown,* 1 N.W. at 490. A common carrier must exercise reasonable care to avoid injuring the passenger and will be liable for negligence "not only for injuries directly suffered in connection with such expulsion, but also for subsequent injuries proximately due thereto, such as an injury from other cars which the ejected passenger could not reasonably avoid, the probable consequences of improper exposure, and the like." *McCoy,* 85 A. at 360. Furthermore, a common carrier cannot escape liability by focusing attention on the passenger's intoxication, provided that "his condition was known to the servants of the carrier, and the consequent injury resulting from such expulsion could have been reasonably anticipated." *Id.* A common carrier has a duty "to care for its intoxicated passenger in a prudent manner, not to leave him in a worse position than when it took charge of him." *Kelleher,* 596 N.Y.S.2d at 139.

¶ 32 By virtue of the special relationship between innkeeper and guest, we conclude that a hotel has a similar legal duty to exercise reasonable care toward its guests. To determine the existence and the contours of this duty in the context of a lawful eviction, we also evaluate the duty factors that we set forth in *HealthONE.*

### 3. Duty Factors

¶ 33 To determine whether a defendant owes a plaintiff a duty to act to avoid

---

4. In 2012, section 314A was replaced by another Restatement provision, which continues to impose an affirmative duty of reasonable care on actors that are part of enumerated special rela-

tionships, including innkeepers. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 40 cmt. a (2012) ("Duty Based on Special Relationship with Another").

**614**

injury, we assess: (1) the risk involved in the defendant's conduct; (2) the foreseeability[5] and likelihood of injury weighed against the social utility of the defendant's conduct; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. *HealthONE*, 50 P.3d at 888; *Smith v. City & Cnty. of Denver*, 726 P.2d 1125, 1127 (Colo. 1986). *See generally* Grund, *supra*, § 10:5, at 143. We address each factor in order, cognizant that no single factor is controlling and that these factors are not exclusive or exhaustive. *See Whitlock*, 744 P.2d at 57.

¶ 34 The risk of drunk driving and injury here was high, even though the possible availability of a taxi may have mitigated that risk. Some (if not all) members of Groh's group were intoxicated. They caused enough of a commotion that the Westin's security guards decided to evict them. Conscious of this intoxication, the Westin's security guards evicted Groh and her companions from the hotel. Ejecting these intoxicated guests from the hotel posed at least two definitive risks of harm: (1) the risk that a drunk person would choose to drive (or travel with a drunk person who drives); and (2) the risk that an evicted guest would suffer some harm because of winter weather conditions. "The risk of harm presented by a belligerent, intoxicated person operating a motor vehicle is foreseeable. It is common knowledge that drunk driving directly results in accidents, injuries and deaths." *Cullum v. McCool*, 432 S.W.3d 829, 835 (Tenn.2013) (internal quotation marks and citation omitted); *see also Lyons v. Nasby*, 770 P.2d 1250, 1254 (Colo.1989) (acknowledging, in a wrongful death action by the mother of an intoxicated patron killed in an automobile accident against a tavern owner, the "obvious possibility that the inebriate might attempt to drive an automobile" and the "risk that the inebri-

ate will suffer severe injury"), *superseded by statute*, § 12–47–801, C.R.S. (2014). Winter weather presents an additional risk of injury to an intoxicated person who is exposed to the elements, such as passing out in a low-visibility location and suffering hypothermia or slipping and falling in icy conditions. *Groh*, ¶ 32.

¶ 35 A reasonable person could foresee that a group of intoxicated individuals evicted from a hotel might be involved in a drunk driving accident that causes injuries. Intoxicated individuals typically have impaired physical abilities and judgment and thus do not always make well-reasoned decisions about transportation home. Despite some social utility in allowing the Westin to end its special relationship with Groh in order to provide other hotel guests with a more secure environment, the seriousness of the potential harm militates in favor of imposing a duty. *See Taco Bell*, 744 P.2d at 49 (explaining that "[a]s the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution" (internal quotation marks and citation omitted)).

¶ 36 Relatively low-cost options are available to ensure that a particular eviction is reasonable in light of the circumstances, including, but not limited to, requesting police assistance, allowing intoxicated guests to wait in the lobby after they call a taxi, or procuring a taxi for an intoxicated guest. Granted, some of these options require that a hotel incur expenses, which in turn it might pass on to its customers. But any modest increase in business costs is justified. *See id.* (finding, in a lawsuit by a patron against a restaurant for injuries sustained during a robbery, that "some economic burden" on the defendant "and a predictable corresponding increase to customers" was acceptable be-

---

**5.** A negligence claim requires two distinct and separate foreseeability analyses. First, foreseeability is an integral element of duty. *See Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 47–49 (Colo. 1987); *see also* John W. Grund, J. Kent Miller & David S. Werber, 7 *Colorado Personal Injury Practice—Torts and Insurance* § 10:5, at 143 (3d ed. 2012) (stating that foreseeability is the "major factor" that Colorado courts consider in determining whether a duty exists). Second, fore-

seeability is the touchstone of proximate cause. *See Ekberg v. Greene*, 196 Colo. 494, 588 P.2d 375, 376–77 (1978); *Boryla v. Pash*, 937 P.2d 813, 818–19 (Colo.App.1996), *rev'd on other grounds*, 960 P.2d 123 (Colo.1998). The former is a question of law for the court; the latter is a question of fact for the jury at trial. *Build It & They Will Drink, Inc. v. Strauch*, 253 P.3d 302, 306 (Colo.2011).

cause the costs of protecting customers from robberies through improvements like better lighting, video cameras, signs, employee training, and locks were "relatively inexpensive").

¶ 37 Taking into account the risk of harm involved in the Westin's conduct, the foreseeability and likelihood of injury to Groh, and low-cost options available to facilitate a safe eviction, coupled with the special relationship between innkeepers and their guests, we hold that the Westin had a duty to exercise reasonable care while evicting Groh,[6] which required the hotel to refrain from evicting her into a foreseeably dangerous environment. Whether a foreseeably dangerous environment existed at the time of eviction depends on Groh's physical state and the conditions into which she was evicted, including the time, the surroundings, and the weather.

¶ 38 In recognizing this duty, we are not implicitly holding that hotels must provide safe transportation off premises during eviction, or even that hotels must ensure that evicted guests actually take advantage of available safe transportation after the eviction occurs.[7] To attempt to fashion liability by imposing a bright-line, inflexible rule that purportedly governs all circumstances would result in "a kind of 'blinking light' of duty that is arbitrary in practice and not helpful to the future development of the law." *Raleigh,* 130 P.3d at 1021 (Mullarkey, C.J., concurring in part and dissenting in part).

¶ 39 In a highly fact-specific case like this one, the appropriate means of addressing limits on liability lie not in the articulation of the duty that exists, but in the application of causation principles:

> The causation element in a tort action functions as a natural limitation of liability.... "[D]uty is a preferable means for addressing limits on liability when those limitations are clear, are based on relatively bright lines, are of general application, do not usually require resort to disputed facts in a case, implicate policy concerns that apply to a class of cases that may not be fully appreciated by a jury deciding a specific case, and are employed in cases in which early resolution of liability is particularly desirable.... On the other hand, when the limits imposed require careful attention to the specific facts of a case, and difficult, often amorphous evaluative judgments for which modest differences in the factual circumstances may change the outcome, scope of liability [or proximate cause] is a more flexible and preferable device for placing limits on liability."

*Id.* (quoting Restatement (Third) of Torts § 29 cmt. f (Proposed Final Draft No. 1, 2005)). The issue of duty is broad in its implication; it is a jury's negligence determination that must be strictly confined to the facts of a particular case. *See Nelson v. Commonwealth Edison Co.,* 124 Ill.App.3d 655, 80 Ill.Dec. 401, 465 N.E.2d 513, 519 (1984).

---

6. Other courts have recognized that an innkeeper must evict a guest in a reasonable manner. For instance, in *Rodriguez v. Primadonna Co.,* 125 Nev. 578, 216 P.3d 793, 799 (2009), the court explicitly recognized that a hotel proprietor evicting a person from the premises has a duty "to act reasonably under the circumstances." *See also Raider v. Dixie Inn,* 198 Ky. 152, 248 S.W. 229, 230 (1923) (considering whether an innkeeper removed a guest "in a proper manner" or whether it "employ[ed] unlawful means to exclude her"); *McClean v. Univ. Club,* 327 Mass. 68, 97 N.E.2d 174, 177–78 (1951) (stating that a private club, though "not strictly a public innkeeper," needed to act "with proper regard to the condition of [a] guest" during the eviction process and was bound "if not expressly then impliedly, ... to accord [the guest] decent and humane treatment and to see to it that its agents

and servants did not abuse or insult him, or unnecessarily subject him to any conduct which would cause him physical discomfort, humiliation or distress of mind or which would imperil his safety"); *see also id.* at 178 (adding that in the event a guest became ill, the club "was bound to pay proper attention to the plaintiff's condition and not evict him in such a manner as would impair his health or endanger his safety").

7. Likewise, we are not imposing a duty that extends to other businesses that provide entertainment (such as taverns, restaurants, concert venues, sports stadiums, and ski areas). Our holding in this case reaches only hotels that lawfully evict guests; it does not govern other entertainment-based businesses because the requisite special relationship is absent.

## B. Scope of Duty

¶ 40 The Westin argues that even if it had a duty to Groh, it ended "at the property line" when she exited the hotel. While alluring in the abstract, this argument suffers from a false premise. The scope of the property does not define the scope of the duty; whether the risk of harm originated during the eviction process does. The scope of the property may, however, relate to the scope of liability through the application of causation principles.

¶ 41 Courts do not hesitate to hold tortfeasors responsible for the consequences of their actions, even when the plaintiff's injuries occur after the parties' relationship appears to have ended (and off the premises). *See, e.g., Jefferson Cnty. Sch. Dist. R–1 v. Justus,* 725 P.2d 767, 772–73 (Colo.1986) (reversing summary judgment in favor of the school district and remanding for trial of negligence claims by a first grader who was injured off premises in a bicycle-car collision); *Sheron v. Lutheran Med. Ctr.,* 18 P.3d 796, 798 (Colo.App.2000) (upholding a jury verdict that found a hospital negligent because the emergency department failed to conduct an adequate mental health status examination and discharged a patient, who committed suicide the next day); *see also Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1149–52 (7th Cir.2010) (finding that bar may have had a duty to protect patron from a criminal attack that occurred more than a mile off premises if that attack was reasonably foreseeable); *Haupt v. Sharkey,* 358 Ill.App.3d 212, 295 Ill.Dec. 47, 832 N.E.2d 198, 203 (2005) (noting that "there is no bright line rule that a tavern owner's duty to protect its patrons from criminal acts of third parties absolutely ends at the precise property line of the tavern" and recognizing an owner–operator's "duty to provide a reasonably safe means of ingress and egress both on his premises and, within limitations dictated by the facts of the case, beyond the precise boundaries of such premises"); *Taylor v. Hynson,* 856 P.2d 278, 281–82 (Okla. 1993) (holding that a restaurant could be liable for injuries to a patron assaulted in the parking lot by other patrons whom the restaurant manager had recently expelled for using profanity and acting in a belligerent manner, where manager asked the name-calling patrons to leave the store but did not check to see if they left the premises). One court has explained that "[t]o hold that [a business's] duty to protect [a guest] ended when [its employee] kicked him off their premises[ ] is to lose sight of the grave responsibility of an innkeeper in respect to his guest which may be likened to that of a carrier to its passenger." *Yashar v. Yakovac,* 48 N.Y.S.2d 128, 134 (N.Y. City Ct.1944).

¶ 42 An innkeeper's duty to protect its guests against an unreasonable risk of physical harm applies when "the risk of harm, or of further harm, arises in the course of th[e] relation" between the parties. Restatement (Second) of Torts § 314A cmt. c. So, in evaluating the scope of the duty here, we examine whether the risk of harm to Groh arose while she remained a guest. This begs the question of when exactly she ceased being a guest.

¶ 43 We analyze Groh's eviction as a process—a series of events that began with a knock on a hotel room door and culminated with actual expulsion from the hotel. *See* Black's Law Dictionary 635 (9th ed. 2009) (defining "eviction" as "the act *or process* of legally dispossessing a person of land or rental property" (emphasis added)). The Westin started the eviction process shortly after its security guards went to Groh's room to confront the occupants about the noise level, entered the room without permission, and engaged in a heated argument with the occupants. During that confrontation, the security guards told everyone except the registered guests to leave the premises. Groh and her companions protested that they were drunk and could not drive. Aware of this intoxicated state, the guards nevertheless escorted the group outside. When one member of the group asked if they could wait in the lobby for a taxi, a guard blocked the door, barred re-entry, and told him, "No, get the f* * * out of here." The "risk of harm" to Groh arose during this eviction process, while the innkeeper–guest special relationship still existed between the Westin and Groh.

## C. Summary Judgment

¶ 44 This case is before us on summary judgment. To be entitled to summary judgment, the Westin must show that no genuine issue of material fact exists. *See Mancuso*, 818 P.2d at 736. "It is only in the clearest of cases that the issue of negligence may properly be disposed of on summary judgment." *Brown v. Martin Marietta Corp.*, 690 P.2d 889, 891 (Colo.App.1984); *accord Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 318 (Colo.1980) (deeming a directed verdict inappropriate because "the issue of negligence presents a question of law in only the clearest of cases and should normally be reserved for the jury unless the facts are undisputed, and it is plain that reasonable persons can draw but one inference from them"). The Westin has not met this burden.

¶ 45 Genuine issues of material fact exist with respect to whether the Westin breached its duty to exercise reasonable care under the circumstances by evicting Groh into a foreseeably dangerous environment (as determined by Groh's physical state and the conditions into which she was evicted). For instance, the record does not contain determinative information on the adequacy of the Westin's training on eviction procedures, the degree of Groh's intoxication, the accessibility of alternative transportation, the parties' knowledge as to the availability of alternative transportation, and the weather conditions at the time of eviction.

¶ 46 The factfinder at trial also will evaluate causation, as well as whether any of the Westin's affirmative defenses limit or bar recovery.[8] For example, the comparative negligence statute, section 13–21–111, C.R.S. (2014), "provides the appropriate framework for examining any negligence on the part of the individual who drives after consuming

alcoholic beverages." *Casebolt*, 829 P.2d at 362 (involving a situation in which an employee died while operating his employer's car while intoxicated).[9]

## D. Dram Shop Act

¶ 47 Groh's complaint does not include a claim against the Westin under the Dram Shop Act of the Colorado Liquor Code, section 12–47–801, C.R.S. (2014).[10] In addition, it is undisputed that the Westin did not serve or provide any alcohol to Groh or her companions. The alcohol in the room apparently went untouched.

¶ 48 Nevertheless, the Westin seeks to invoke the Act's protection by arguing that it would be unreasonable to hold a nonprovider of alcohol liable for injuries stemming from voluntary intoxication while providing the actual providers of alcohol with limited liability. It also cites the Act as an example of how public policy supports holding intoxicated people responsible for their own actions.

¶ 49 Despite their logical underpinnings, these arguments fail based on the plain language of the Act. The Act abolishes common law actions against liquor licensees and social hosts who sell or serve alcoholic beverages and makes the liability of alcohol vendors a creature of statute. *See* § 12–47–801(1); *see, e.g.*, *Charlton v. Kimata*, 815 P.2d 946, 948–49 (Colo.1991) (stating that the liability of alcohol vendors and social hosts "has been strictly a creature of statute" since the Act's passage). It "provides the sole means for someone injured by an intoxicated person to obtain a remedy *from the vendor who sold or provided alcohol to the intoxicated person*." *Build It & They Will Drink*, 253 P.3d at 303 (emphasis added). And, "in certain cases" not relevant here, it defines the proximate cause of injuries or damages inflicted on another by an intoxicated person

---

**8.** The Westin asserts twelve affirmative defenses—including contributory negligence, comparative negligence, third party fault, assumption of risk, failure to mitigate, and breach of contract.

**9.** The statute provides that a plaintiff's contributory negligence does not bar recovery in a negligence action provided that "such negligence was not as great as the negligence of the person against whom recovery is sought." § 13–21–

111(1). But it limits recovery in that "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage, or death recovery is made." *Id.*

**10.** Groh did assert a claim under the Act against three of the nightclubs that provided alcohol to Reed, the driver in the fatal crash, but that claim is not before us.

in terms of "the consumption of alcohol beverages rather than the sale, service, or provision thereof." § 12–47–801(1). Simply put, the Westin does not fall within the Act's purview because it did not sell, serve, or otherwise provide alcohol to Groh or her companions.

¶ 50 Although the Act does not protect the Westin from liability for negligence, the concept of individual responsibility that underlies it may still come into play. The jury may factor this into its determination of whether the Westin breached its duty to Groh and whether its actions during the eviction were the proximate cause of Groh's injuries.

## V. Conclusion

¶ 51 Based on the special relationship that exists between an innkeeper and guest, we hold that a hotel that evicts a guest has a duty to exercise reasonable care under the circumstances. This requires the hotel to refrain from evicting an intoxicated guest into a foreseeably dangerous environment. Whether a foreseeably dangerous environment existed at the time of eviction depends on the guest's physical state and the conditions into which he or she was evicted, including the time, the surroundings, and the weather. In this case, genuine issues of material fact preclude summary judgment on Groh's claims of negligence and negligent hiring and training. We also hold that the Dram Shop Act does not apply in this case because it is undisputed that the Westin did not serve alcohol to Groh. Consequently, we affirm the judgment of the court of appeals and remand for further proceedings.

JUSTICE EID dissents, and JUSTICE COATS joins in the dissent.

JUSTICE EID, dissenting.

¶ 52 The majority devotes almost the entirety of its opinion coming to the conclusion that the Westin owed its guest Groh a general duty of reasonable care during the eviction process, which, in this case, means refraining from evicting a guest into an unreasonably dangerous environment. Maj. op. ¶¶ 22–46. I agree with this entirely unremarkable position, as did the author of the initial panel opinion below affirming summary judgment in the Westin's favor. *See Groh v. Westin Operator, LLC,* 2012 COA 189, slip op. at 17, *withdrawn,* 2013 COA 39, — P.3d ——; *Groh v. Westin Operator, LLC,* 2013 COA 39, ¶ 57, —— P.3d —— (Furman, J., concurring in part and dissenting in part). The important question in this case, however, is the application of that duty to the circumstances presented here. In my view, the duty was plainly satisfied, as the group discussed taking a taxi, Groh's brother told her to take a taxi, video footage shows Groh and her companions walking by two taxi cabs on the way to her car, and there is no suggestion that Groh was so intoxicated that she could not call or get into a taxi. Yet the majority sets the evidentiary burden so high—demanding evidence regarding the actual availability of taxis at the time and place of eviction and the parties' knowledge thereof—that summary judgment could never be awarded in an eviction case. For this reason, I respectfully dissent from the majority's opinion.

¶ 53 The majority correctly holds that the Westin had a duty not to evict Groh into an unreasonably dangerous environment, which in turn may depend upon "[an evicted guest's] physical state and the conditions into which she was evicted, including the time, the surroundings, and the weather." Maj. op. ¶ 37. But then it holds that summary judgment is inappropriate in this case because "the record does not contain *determinative information* on ... the degree of Groh's intoxication, the accessibility of alternative transportation, the parties' knowledge as to the availability of alternative transportation, and the weather conditions at the time of eviction." *Id.* at ¶ 45 (emphasis added). In coming to this conclusion, the majority suggests that each of these factors is material to the analysis and must be factually developed and "determin[ed]" (presumably in the Westin's favor) before summary judgment can be awarded. But these considerations simply help to inform the ultimate inquiry—namely, whether the guest was evicted into an unreasonably dangerous environment. And here, under the undisputed (and material) facts, Groh was not.

¶ 54 Video footage shows Groh and her companions walking by two taxi cabs. The footage also shows one of her companions pointing toward the cab stand in front of the Westin. Groh's brother told her to take a cab, and the group had a short discussion about taking a cab. Significantly, Groh does not dispute any of these facts. Because undisputed evidence demonstrates that Groh was evicted into an environment where alternative transportation was available, summary judgment in the Westin's favor is appropriate.

¶ 55 The majority disagrees, concluding that the record lacks, among other things, "determinative information" regarding "the degree of Groh's intoxication." *Id.* But the majority does not explain why such information would matter in this case. Indeed, the intoxication of Groh and her companions caused the eviction in the first place; no one disputes this. *Id.* at ¶ 43. Presuming intoxication, the issue is whether Groh was evicted into an unreasonably dangerous environment. As noted above, undisputed evidence shows that she called her brother, who told her to get a taxi, the group talked about getting a taxi, and she walked past taxis to get to her car. There is no suggestion that she was so intoxicated that she could not call or get into a taxi. *Compare id., with Kelleher v. F.M.E. Auto Leasing Corp.,* 192 A.D.2d 581, 596 N.Y.S.2d 136, 139 (1993) (holding that where cab driver pulled seventy-two-year-old intoxicated passenger out of cab by his ankles and dropped him onto an unknown person's snowy driveway a quarter of a mile away from his home, passenger, who later died, could not be held comparatively negligent due to intoxication). Therefore, there is no material dispute regarding Groh's intoxication that would preclude summary judgment.

¶ 56 The majority also suggests that the record lacks "determinative information" regarding "the weather conditions at the time of the eviction." Maj. op. ¶ 45. But again, the majority does not explain how such information would impact this case. No one disputes that the incident occurred on a cold March evening. *Id.* at ¶ 2. But there is no suggestion that the weather somehow prevented Groh from obtaining a taxi. *Compare id., with McCoy v. Millville Traction Co.,* 83 N.J.L. 508, 85 A. 358, 360 (N.J.1912) (jury question whether intoxicated passenger was ejected into a "dangerous" situation where he had to cross two-foot snow banks to reach shelter). Indeed, the group had to walk farther to reach Groh's car than to reach a taxi. Again, there is no material dispute in the record regarding the weather that would preclude summary judgment.

¶ 57 Finally, the majority states that the record lacks "determinative information" regarding "the accessibility of alternative transportation [and] the parties' knowledge as to the availability of alternative transportation." Maj. op. ¶ 45. In other words, Westin must not only show that taxis *were available,* but that the "parties" (presumably all of Groh's companions) *knew that they were available.* The majority sets forth an almost impossible evidentiary burden, requiring not only tracking down taxis on a particular date and time over eight years ago, but also determining whether they were carrying passengers at the time, and then establishing the knowledge of multiple people as to the taxis' status at that date and time. But while impossible, this evidentiary burden is entirely unnecessary. Again, the majority does not explain why this information is relevant to the case at hand. The question is whether Groh was evicted into an unreasonably dangerous environment, and the undisputed evidence shows she was not. Again, as with the weather and Groh's intoxication, there is no material dispute regarding the availability of taxis that would preclude summary judgment.

¶ 58 The majority's analysis in this case is problematic for two interrelated reasons. First, as a general matter, the "every factor is relevant" approach means that every eviction case will have to go to a jury. Indeed, under the majority's approach, summary judgment will never be appropriate because the factfinder must weigh all of the factors and come to a determination. As the majority sees it, eviction cases are simply not eligible for being decided on summary judgment because they are "highly fact-specific." *Id.* at ¶ 39.

¶ 59 In fact, the majority emphasizes the point by "analyz[ing] Groh's eviction *as a process*—a series of events that began with a knock on a hotel room door and culminated with actual expulsion from the hotel." *Id.* at ¶ 43 (emphasis added). As the majority continues:

> The Westin started the eviction process shortly after its security guards went to Groh's room to confront the occupants about the noise level, entered the room without permission, and engaged in a heated argument with the occupants. During that confrontation, the security guards told everyone except the registered guests to leave the premises. Groh and her companions protested that they were drunk and could not drive. Aware of this intoxicated state, the guards escorted the group outside. When one member of the group asked if they could wait in the lobby for a taxi, a guard blocked the door, barred reentry, and [used a profanity].

*Id.* Yet as the majority indicates elsewhere in its opinion, this was a lawful eviction, and the propriety of the eviction itself is not at issue. *Id.* at ¶¶ 22, 38 n.7. And while the behavior of the security guards was unquestionably unprofessional, such behavior does nothing to change the availability of taxis, nor did it prevent Groh and her companions from getting a taxi, or create a dangerous environment. The majority's emphasis on the eviction "process" simply underscores the fact that its "all factors are relevant" approach precludes summary judgment in this—and virtually every other—case.

¶ 60 Second, and more importantly, the majority's analysis imposes a duty on innkeepers to ensure that an evicted guest actually takes alternative transportation. Although the majority protests that it does not impose such a burden, *id.* at ¶ 38, that is the only way that the Westin could have "ensure[d] that a particular eviction [was] reasonable in light of the circumstances." *Id.* at ¶ 36; *see also id.* at ¶ 34 (noting that "the possible availability of a taxi" would have only "mitigated" the risk present here). The majority does suggest that the Westin could have "allow[ed] intoxicated guests to wait in the lobby after they call[ed] a taxi," *id.* at ¶ 36, but, as noted above, there is no indication that the security guards prevented Groh from getting into a taxi in this case. The majority also suggests that the Westin could have requested police assistance, id. but, again, the eviction itself was lawful; there was no need to request police assistance to evict the guests. All that is left is ensuring that the evicted guest actually takes alternative transportation off the property. I know of no authority, and the majority cites none, that would impose a duty on innkeepers to ensure safe transportation for evicted guests. *See Rodriguez v. Primadonna Co.,* 125 Nev. 578, 216 P.3d 793, 800 (2009) (refusing to impose such a duty).

¶ 61 The majority makes light of the burden it imposes on innkeepers, suggesting that ensuring that evicted guests actually take alternative transportation off the property would be a "[r]elatively low-cost option[ ]." Maj. op. ¶ 36; *see also id.* ("any modest increase in business costs is justified"). But the majority fails to look at the larger picture, which is that its reasoning would apply to impose a duty to provide safe transportation for evicted guests on the entire Colorado hotel industry–indeed, on all businesses involved in providing "entertainment." *But see id.* at ¶ 38 n.7 (stating that it is not imposing a duty on all "entertainment" businesses). While it is not possible to precisely quantify the burden that the majority is placing on Colorado businesses at this stage, surely it is not the trivial obligation the majority makes it out to be. Under such circumstances, the majority should proceed cautiously. Because the majority does not do so, I respectfully dissent from its opinion.

I am authorized to state that JUSTICE COATS joins in this dissent.