Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 15, 2020

**2020 CO 55**

**No. 19SC116, *Garcia v. Colorado Cab Co.* — Torts — Negligence — Rescue Doctrine.**

In this case, the supreme court considers what is required for a person to qualify as a rescuer under the rescue doctrine. The court holds that for a person to qualify as a rescuer under the rescue doctrine, he must satisfy a three-pronged test: He must have (1) intended to aid or rescue a person whom he, (2) reasonably believed was in imminent peril, and (3) acted in such a way that could have reasonably succeeded or did succeed in preventing or alleviating such peril. Applying this test to the facts of this case, the court concludes that the plaintiff qualified as a rescuer under the rescue doctrine. Because the court of appeals concluded that the plaintiff did not qualify as a rescuer because he did not physically intervene, the supreme court reverses the judgment of the court of appeals and remands for the court of appeals to address the remaining issues raised on appeal.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2020 CO 55

### Supreme Court Case No. 19SC116
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA1381

### Petitioner:

Jose Garcia,

v.

### Respondent:

Colorado Cab Company LLC, a Colorado limited liability company d/b/a Denver Yellow Cab.

### Judgment Reversed
*en banc*
June 15, 2020

**Attorneys for Petitioner:**
Foster, Graham, Milstein & Calisher, LLP
Chip G. Schoneberger
Daniel S. Foster
Laura M. Martinez
*Denver, Colorado*

**Attorneys for Respondent:**
White and Steele, PC
John Lebsack
Keith R. Olivera
E. Catlynne Shadakofsky
*Denver, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** does not participate.

¶1    As the famed jurist Benjamin N. Cardozo put it, "[d]anger invites rescue. The cry of distress is the summons to relief." *Wagner v. Int'l Ry. Co.*, 133 N.E. 437, 437 (N.Y. 1921).  Following this logic, courts adopted the rescue doctrine, which ensures that negligent actors who put others at risk may be held liable when their negligence injures a third-party rescuer.  The rescue doctrine, in other words, is one way the law acknowledges the human instinct to help those in need, even at the risk of one's own safety.  This case requires us to determine whether an individual must exert some bodily movement of a specific degree or nature to qualify as a rescuer under the rescue doctrine.[1]

¶2    We conclude that a stringent physicality requirement unduly narrows the rescue doctrine.  We hold instead that for a person to qualify as a rescuer under the rescue doctrine, he must satisfy a three-pronged test: The plaintiff must have (1)  intended to aid or rescue a person whom he, (2)  reasonably believed was in imminent peril, and (3) acted in such a way that could have reasonably succeeded

---

[1] Specifically, we granted certiorari to answer the following question:

> Whether the court of appeals improperly narrowed the rescue doctrine's application by creating a legal standard for determining rescuer status predicated solely on "bodily movement" of a specific degree or nature and excluding other effort reasonably aimed at, or successfully effecting, a rescue.

or did succeed in preventing or alleviating such peril. We conclude that, on the facts of this case, plaintiff-petitioner Jose Garcia satisfied this test at trial.

## I. Facts and Procedural History

¶3 A driver for Colorado Cab Company LLC ("Colorado Cab") picked up an intoxicated Curt Glinton and one of Glinton's friends. After stopping at their destination, the driver told Glinton the total fare. Glinton became upset, started yelling at the driver, and eventually grabbed and punched the driver from behind.

¶4 Meanwhile, Garcia had called a cab from a house nearby. When he saw the cab occupied by Glinton drive by, he thought that it might be the cab he had called, and he began to follow it. When he was roughly a block away from the cab, he heard the driver screaming for help. Garcia ran to the cab and, through the cab's open driver's-side door, told Glinton to stop. Glinton shifted his aggression to Garcia, telling him to "mind his own business." This gave the driver the chance to exit the vehicle. Glinton also exited the vehicle, escalated his aggression toward Garcia, and began to throw punches at Garcia. Garcia was then hit over the head in the melee, causing him to fall to the ground.

¶5 Glinton then entered the driver's seat of the still-running cab and started driving. He hit the still-down Garcia once with the cab, then backed up and again ran Garcia over. As a result, Garcia suffered several severe injuries.[2]

¶6 Garcia filed a negligence action against Colorado Cab, arguing that Colorado Cab had knowledge of forty-four passenger attacks on its drivers in the previous three years but had failed to install partitions or security cameras in its cabs. In asserting his claim, Garcia relied on the rescue doctrine. He argued that he was injured while rescuing the driver, who was owed a duty by Colorado Cab, meaning it also owed a duty to him. Colorado Cab countered that it owed no duty to Garcia to prevent intentional criminal acts, and that even if it was negligent, Garcia was comparatively negligent because he "[made] a decision to get involved in the situation" and is "at least partially responsible for becoming involved in this incident." The case went to a jury trial.

¶7 At trial, the trial court instructed the jury that "[t]he criminal act of a third party that causes injury, including to a rescuer, does not relieve the defendant of liability if the criminal act of the third party is reasonably foreseeable." The jury instructions also explained comparative negligence and required the jury to

---

[2] In a separate criminal proceeding, Glinton pleaded guilty to second-degree assault with a deadly weapon.

determine whether Garcia acted reasonably under the circumstances to protect himself or others from injury.

¶8 The jury found for Garcia and awarded him $1.6 million in total damages. It allocated 45% of the fault to Colorado Cab (for a sum of roughly $720,000), 55% to Glinton, and 0% to Garcia.

¶9 Colorado Cab moved for judgment notwithstanding the verdict, arguing that it did not owe a duty to Garcia. The trial court denied the motion, finding that, as relevant here, Colorado Cab's arguments failed "to adequately address [Garcia's] status as a rescuer." The court elaborated that Colorado Cab undoubtedly owed a duty to the driver, which created a "derivative duty owed to the rescuer," i.e., Garcia, because it was foreseeable that a rescuer could appear if Colorado Cab breached its duty to the driver.

¶10 Colorado Cab appealed, and a division of the court of appeals reversed. *Garcia v. Colo. Cab Co.*, 2019 COA 3, ¶ 1, __ P.3d __. As relevant here, the division concluded that Colorado Cab did not owe a duty to Garcia as a rescuer because, "to be deemed a rescuer, the plaintiff must have taken some concrete physical action—that is, some bodily movement and effort—to save the other person from imminent peril." *Id.* at ¶ 17. According to the division, Garcia did not meet this standard because he "merely approached the cab and told [the driver] and Glinton to stop fighting." *Id.* at ¶ 19. Had Garcia "[gotten] between the two men or tr[ied]

6

to pull one away from the other," the division reasoned, then Garcia would likely have exerted the necessary level of concrete physical action. *Id.* Because the division concluded that Garcia was not a rescuer, it did not decide the remaining issues argued on appeal. *Id.* at ¶ 20 n.9.

¶11 Garcia petitioned this court for review, and we granted certiorari.

## II. Analysis

¶12 We first determine the applicable standard of review. Next, we examine relevant rescue doctrine case law from Colorado and other jurisdictions in conjunction with the purpose of the rescue doctrine, and we conclude that the rescue doctrine does not require that a person exert physical action to qualify as a rescuer. In so doing, we conclude that there are three important elements for determining whether a plaintiff qualifies as a rescuer for the purpose of the rescue doctrine: the plaintiff's purpose, whether he reasonably believed there was imminent peril, and the utility of his action. Thus, we hold that for a person to qualify as a rescuer under the rescue doctrine, he must satisfy a three-pronged test: He must have (1) intended to aid or rescue a person whom he, (2) reasonably believed was in imminent peril, and (3) acted in such a way that could have reasonably succeeded or did succeed in preventing or alleviating such peril.

## A. Standard of Review

¶13 The question of Garcia's status as a rescuer arose in the context of whether Colorado Cab owed Garcia a duty. "Whether a defendant owes a legal duty to a plaintiff is a question of law." *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 18, 347 P.3d 606, 611. Further, because the controlling facts are undisputed, "the legal effect of those facts [also] constitutes a question of law," which we review de novo. *Hicks v. Londre*, 125 P.3d 452, 455 (Colo. 2005).

## B. The Rescue Doctrine

¶14 The rescue doctrine traces back to then-Judge Cardozo's opinion in *Wagner*. In *Wagner*, the plaintiff and his cousin boarded a packed train. 133 N.E. at 437. Sometime after the train began moving, the cousin was thrown from it after the conductor failed to close the train's doors. *Id.* The plaintiff exited the train to search for his cousin underneath a nearby bridge, and he ultimately fell off the bridge's trestle. *Id.* On the relationship among the law, human instinct, and rescuers, the court recognized that people act instinctively to help another in peril:

> Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer . . . . The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had.

*Id.* at 437–48. The court then remanded the case for a trial because the question of whether the plaintiff, in his rescue attempt, "was foolhardy or reasonable in the light of the emergency confronting him" was a question for the jury. *Id.* at 438.

¶15 In Colorado, neither this court nor the court of appeals has opined on the rescue doctrine at length since *Wagner*, but both courts have provided guidance on it. In *Maloney v. Jussel*, 241 P.2d 862, 863 (Colo. 1952), two cars collided, causing one of the car's passengers to be thrown from the front seat to the floor of the car. So as not to aggravate her injuries, she was told by her fellow passengers to stay still. *Id.* The plaintiff, having heard the sound of the crash, exited his home to investigate it. *Id.* at 864. He approached the car and spoke with the thrown passenger, and, while talking with her, he was then hit by another car and injured. *Id.* We concluded that the plaintiff did not qualify as a rescuer because the passenger was not in imminent peril and thus there was nothing for the plaintiff to rescue her from. *Id.* at 867. Similarly, in *Connelly v. Redman Development Corp.*, 533 P.2d 53, 54–55 (Colo. App. 1975), the court of appeals concluded that the plaintiff, who slipped when investigating a baby's cry, could not qualify as a rescuer because there was no evidence that the baby was in imminent peril.

¶16 Other jurisdictions, building on the foundation laid in *Wagner*, have defined and developed the rescue doctrine to a greater extent than Colorado courts. In

9

*Barnes v. Geiger*, 446 N.E.2d 78, 82 (Mass. App. Ct. 1983), the plaintiff died of a cerebral vascular hemorrhage a day after running to the scene of a car crash, which she mistakenly believed involved her child. Her estate alleged that witnessing the accident and responding to it had elevated her blood pressure and triggered bleeding within her brain. *Id.* Synthesizing other jurisdictions' approaches to the rescue doctrine, the Appeals Court of Massachusetts concluded that "[t]o achieve the status of a rescuer, a claimant's purpose must be more than investigatory. There must be asserted some specific mission of assistance by which the plight of the imperilled could reasonably be thought to be ameliorated." *Id.* Applying that standard, the court held that the plaintiff could not qualify as a rescuer for the purposes of the rescue doctrine because she was merely investigating the scene of the accident. *Id.*

¶17    Similarly, in *Lambert v. Parrish*, 492 N.E.2d 289, 290–91 (Ind. 1986), the plaintiff slipped on a patch of ice as he ran toward the scene of a car accident where his wife's car and another car had collided, and he sued the driver of the other car. *Id.* at 290. The Supreme Court of Indiana held that "a rescuer must in fact attempt to rescue someone. A rescuer is one who actually undertakes physical activity in a reasonable and prudent attempt to rescue." *Id.* at 291. Based on this test, the plaintiff did not qualify as a rescuer because "[h]is only attempt was to reach the

10

scene of the accident," and "[h]e exerted no physical activity to facilitate the rescue of his wife from the consequences of the allegedly tortious acts of [the driver]." *Id.*

¶18 As intimated in these cases and in *Wagner*, the primary purpose of the rescue doctrine is to legally account for the human instinct to help those in distress. Because of this human instinct, the doctrine seeks to prevent wrongdoers from using typical negligence defenses—such as rules related to duty or contributory negligence—as an escape hatch to avoid liability to rescuers. *See* Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 32 cmt. b (Am. Law Inst. 2010) ("The 'rescue doctrine' addresses a mélange of issues that arise when a rescuer is injured in attempting to assist another. These issues include duty, scope of liability, superseding cause, contributory negligence, and assumption of risk."); *see also Ha-Sidi by Ha-Sidi v. S. Country Cent. Sch. Dist.*, 148 A.D.2d 580, 582 (N.Y. App. Div. 1989) ("The doctrine was created to avoid a plaintiff being found contributorily negligent as a matter of law when he voluntarily placed himself in a perilous situation to prevent another person from suffering serious injury or death.").

¶19 In the instant case, the court of appeals focused on Garcia's degree of physical exertion, as opposed to whether his actions were consistent with the rescue doctrine's purpose. *See Garcia*, ¶¶ 15–19. It concluded that a plaintiff must exert "some concrete physical action—that is, some bodily movement and

effort"—to be deemed a rescuer, and it reasoned that Garcia would have met this standard had he "g[otten] between the two men or tr[ied] to pull one away from the other." *Id.* at ¶¶ 17, 19.

¶20 We conclude that such a requirement goes too far. The human instinct to help those in distress will not always take the form of overt physical exertion, and it would be unwise and perhaps unsafe to always require physical intervention. To start, requiring that a plaintiff physically intervene fails to account for a person's purpose in acting and whether the rescue attempt succeeded, or reasonably could have succeeded, at thwarting any imminent peril. To be sure, trying to pull an attacker away would certainly be clear evidence of a person's intent to rescue and an effective way to prevent imminent peril to the person being attacked, but physically intervening is not the only way to attempt such a rescue.

¶21 Further, a requirement that a plaintiff actually physically intervene might lead to distorted incentives; to require physical intervention might needlessly encourage it. Were we to require that well-intentioned rescuers physically intervene, we would risk either encouraging the escalation of violence or, conversely, discouraging any intervention at all. Besides, a nonphysical intervention may be just as, if not more, effective in stopping violence. In other words, under the *Garcia* division's holding, a plaintiff who threw a punch at an attacker would have a better chance at qualifying as a rescuer than a plaintiff like

12

Garcia who saw the same altercation but instead approached the attacker and yelled at him to stop. In both scenarios, the rescuers put themselves in harm's way to stop the violence and prevent injury, but only the one who physically touched the attacker would qualify as a rescuer.

¶22 Such a result is anathema to the rescue doctrine. The doctrine seeks to encourage the instinct to help. Requiring physical intervention does not further that goal and may, in fact, increase the risk of harm. Thus, we conclude that the *Garcia* division's holding unduly narrowed the rescue doctrine.

## C. The Proper Test

¶23 Rather than requiring physical intervention, the relevant case law and the rescue doctrine's purpose illustrate that there are three important factors in assessing whether a plaintiff can qualify as a rescuer: (1) the plaintiff's purpose in acting, (2) the plaintiff's reasonable belief that someone was in imminent peril, and (3) the utility of the plaintiff's conduct.

¶24 First, a plaintiff's purpose in acting is critical for the rescue doctrine. After all, the rescue doctrine seeks to protect only those who genuinely act on the instinct to help. This is what courts in cases like *Barnes* have emphasized: A plaintiff who happens to get injured while investigating the scene of an accident cannot sue under the rescue doctrine. *See* 446 N.E.2d at 82 ("[A] claimant's purpose must be

13

more than investigatory.").  Instead, a plaintiff must actually intend to aid or rescue.

¶25    Second, this intent must be based on a reasonable belief that someone is in imminent peril.  The rescue doctrine is not designed to protect those who respond to obviously benign situations.  For example, a baby's cry alone is not evidence of imminent peril, *see Connelly*, 533 P.2d at 55; neither is a car crash alone evidence that the crash's victim is in imminent peril when that victim is engaging in casual conversation, *see Maloney*, 241 P.2d at 867.  But the presence or absence of danger is not always certain; a person may genuinely and reasonably believe that a third party is in imminent peril even when that is not the case.  Therefore, we conclude that a plaintiff must have reasonably believed that someone was in imminent peril to qualify as a rescuer.

¶26    Third, the plaintiff's action must have some utility; it must stand a chance at substantially helping the person(s) in peril.  Intent to rescue alone is not enough because the rescue doctrine was created for those who actually effectuate their intent to help, not for those who claim to want to help but instead do nothing.  Thus, a plaintiff's conduct must be reasonably calculated to prevent or alleviate the imminent peril.  Accordingly, a mere warning or observation will not suffice because calling attention to incoming danger is vastly different from attempting to thwart or eliminate imminent danger.  *See Schwartzman v. Del. Coach Co.*,

14

264 A.2d 519, 520 (Del. Super. Ct. 1970) (holding that the plaintiff was not a rescuer because he gave "only a verbal warning" that a car crash was about to occur).

¶27    Synthesizing these principles, we hold that for a person to qualify as a rescuer under the rescue doctrine, he must satisfy a three-pronged test: He must have (1) intended to aid or rescue a person whom he, (2) reasonably believed was in imminent peril, and (3) acted in such a way that could have reasonably succeeded or did succeed in preventing or alleviating such peril.

¶28    Having formulated the contours of the rescue doctrine, we now turn to the facts of Garcia's case.

### III. Application

¶29    The record of the case before us evidences that Garcia satisfied this test and thus qualified as a rescuer.

¶30    First, Garcia intended to rescue the driver. Garcia testified that when he ran up to the cab, he saw Glinton punching the driver. He could have walked away. Instead, he chose to get involved and, according to his testimony, "went to help" the driver; he stuck his head in the cab and started yelling at Glinton to stop. The only possible explanation for this conduct is that Garcia intended to aid the driver.

¶31    Second, it is clear that Garcia reasonably believed that the driver was in imminent peril. Garcia testified that he ran to the cab because he heard the driver yelling, "help me, help me, they're hurting me, they're trying to kill me." And the

15

attack that Garcia saw when he approached the cab confirmed that the driver was, in fact, in imminent peril. As Garcia testified, the driver "could have been murdered" that night.

¶32 Last, Garcia succeeded in preventing the driver's imminent peril. He jogged to the cab and, within feet of the violent aggressor, yelled at Glinton to stop. This was not a mere warning to the driver that danger was coming; the danger was imminent, and the driver's best chance at escape was for a bystander to intervene. That is exactly what Garcia did. In other words, Garcia's conduct had real utility in helping the driver and was ultimately successful.

¶33 Thus, the record establishes that Garcia satisfied the three-pronged test we are announcing today, meaning Colorado Cab owed a duty to Garcia as a rescuer of the driver if it owed a duty to the driver.

## IV. Conclusion

¶34 For the foregoing reasons, we reverse the judgment of the court of appeals and remand for the court of appeals to address Colorado Cab's remaining issues argued on appeal.

**JUSTICE MÁRQUEZ** does not participate.